IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MARYLYNN HARTSEL and DEANNA PARKER, derivatively on behalf of Nominal Defendants, | |
| Plaintiffs, | |
| - against - | CIVIL ACTION NO. _____ |
| THE VANGUARD GROUP, INC., JOHN J. BRENNAN, CHARLES D. ELLIS, RAJIV L. GUPTA, AMY GUTMANN, JOANN HEFFERNAN HEISEN, ANDRE F. PEROLD, ALFRED M. RANKIN, JR., and J. LAWRENCE WILSON; ACADIAN ASSET MANAGEMENT, LLC, and MARATHON ASSET MANAGEMENT, LLP, | VERIFIED COMPLAINT |
| Defendants, | |
| - and - | |
| VANGUARD INTERNATIONAL EQUITY INDEX FUNDS, d/b/a VANGUARD EUROPEAN STOCK INDEX FUND, and VANGUARD HORIZON FUNDS, d/b/a VANGUARD GLOBAL EQUITY FUND, | |
| Nominal Defendants. | |

Plaintiffs respectfully allege as follows:

### NATURE OF THE ACTION

1.    This lawsuit arises from unlawful acts committed by the defendants
("Defendants") when they illegally invested money entrusted to them by the plaintiffs
("Plaintiffs") in a series of illegal offshore gambling businesses. The foreign gambling
enterprises were criminal organizations whose principal operations violated numerous federal
and state criminal laws. The investments themselves violated federal criminal statutes,

---

including 18 U.S.C. § 1955 and 18 U.S.C. § 1962. These unlawful investments were virtually wiped out when the U.S. government increased law enforcement efforts against the illegal gambling businesses beginning in July 2006.

2.      As a result of the increased law enforcement, the illegal gambling businesses in which Defendants invested (and their principals) have since forfeited to the U.S. almost $650 million in criminal proceeds. Their founders have pleaded guilty to criminal offenses subjecting them to significant fines and sentences.

3.      Each Plaintiff is a shareholder in one or more of the nominal defendants: (a) Vanguard International Equity Index Funds ("VIEF"), through its mutual fund series known as Vanguard European Stock Index Fund ("Vanguard European"); and (b) Vanguard Horizon Funds ("VHF"), through its mutual fund series known as Vanguard Global Equity Fund ("Vanguard Global"). VIEF and VHF together are referred to as the "Nominal Defendants." Vanguard European and Vanguard Global together are referred to as the "Vanguard Funds."

4.      Defendants – the fiduciaries responsible for managing and advising the Vanguard Funds – knowingly caused the Vanguard Funds unlawfully to use investors' money to purchase shares of four illegal off-shore Internet gambling businesses that accepted and processed wagers from gamblers in the U.S. These four entities were: (a) Sportingbet PLC ("Sportingbet"); (b) PartyGaming Plc ("PartyGaming"); (c) bwin Interactive Entertainment AG (formerly, BETandWIN.com Interactive Entertainment AG) ("Bwin"); and (d) NETeller Plc ("NETeller").

5.      To evade the reach of the U.S. criminal justice system, none of the foregoing illegal gambling businesses offered their shares for sale to, or for the benefit of, persons in

the U.S. They did not list their shares to be traded on any U.S. exchange through American Depository Receipts or otherwise because the United States Department of Justice ("DOJ") considered the companies to be illegal gambling businesses. As a result, Defendants purchased shares of these companies overseas to circumvent these restrictions.

6.      The value of those investments plummeted following the increase in U.S. law enforcement beginning in July 2006. The value of those businesses depended on the continuation of their illegal revenue stream from the U.S. For example, by the middle of 2006, PartyGaming generated nearly 90% of its $342 million in annual revenue from illegal gambling operations in the U.S. When U.S. law enforcement choked off this illegal source of revenue, the value of PartyGaming, and, concomitantly, the value of Defendants' unlawful investments in PartyGaming, dropped to account for this loss of revenue.

7.      Each dollar that Defendants lost by investing in illegal gambling businesses directly translated to a dollar lost by the investors in the Vanguard Funds because the value of their shares in the Vanguard Funds is based on the net asset value of each of the mutual funds' portfolio.

8.      Prior to making the investments complained of herein, Defendants knew that the illegal gambling businesses in which Defendants caused the Nominal Defendants, through the Vanguard Funds, to invest were violating U.S. criminal laws. For example, prior to 2006:

> (a)      the DOJ had issued public warnings that Internet gambling companies that take wagers from gamblers in the U.S. were criminal organizations – and cautioned the public that supporting them was itself a crime;

(b)     PartyGaming's June 2005 prospectus warned Defendants that "in many countries, including the United States, the Group's activities are considered to be illegal by relevant authorities."

(c)     NETeller had disclosed to Defendants in its April 8, 2004 prospectus that the DOJ considered that NETeller's principal operations violated various criminal statutes in the U.S. and that there "could be no assurance that the US will not threaten or try to prosecute the NETeller Group under federal law at some stage under existing or future regulations."

(d)     there had been successful prosecutions of principals of similar off-shore businesses, and those prosecutions had been widely reported in the press;

(e)     the DOJ had prohibited financial institutions from processing financial transactions for off-shore Internet gambling businesses that take wagers from gamblers in the U.S.; and

(f)     the federal government had seized millions of dollars that PartyGaming had paid Discovery Communications (the television and media company that owns the Travel Channel) and other media companies for advertising.

9.     18 U.S.C. § 1955 ("§ 1955") makes it a felony to "own all or part of an illegal gambling business."

10.     Sportingbet, PartyGaming, Bwin, and NETeller were each an "illegal gambling business" within the meaning of § 1955.

11.     By causing the Nominal Defendants, through the Vanguard Funds, to purchase and continue to own shares in Sportingbet, PartyGaming, Bwin, and NETeller, Defendants caused the Nominal Defendants to violate § 1955.

12.     By causing the Nominal Defendants, through the Vanguard Funds, to violate § 1955, Defendants also violated the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-68 ("RICO").

13.    A violation of § 1955 is a predicate crime under RICO. 18 U.S.C. § 1961(1)(B).

14.    Therefore, when Defendants caused the Nominal Defendants, through the Vanguard F36unds, to purchase shares of illegal gambling businesses repeatedly and over a significant period of time, Defendants conducted the affairs of the Nominal Defendants through a pattern of racketeering in violation of 18 U.S.C. § 1962(c).

15.    Defendants also conspired to violate 18 U.S.C. §1962(c) within the meaning of 18 U.S.C. § 1962(d).

16.    Defendants sought to profit from the wrongdoing of the illegal gambling businesses.

17.    Plaintiffs assert against Defendants common law claims for breach of fiduciary duty, negligence and waste.

**JURISDICTION AND VENUE**

18.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 (federal question), 1332 (diversity), 1337 (commerce regulation) and 1367(a) (supplemental jurisdiction).

19.    Venue is proper in this district pursuant to 28 U.S.C. § 1391, because some of the acts and practices complained of herein occurred in substantial part within this district and because one or more Defendants reside, has an agent in, or transacts their affairs within this district. Moreover, the contracts pursuant to which The Vanguard Group, Inc., Acadian Asset Management, LLC and Marathon Asset Management, LLP (the "Investment Advisor Defendants") provided investment management services to the Funds confirm that such

contracts and services performed thereunder are understood to be "made" and "performed in" Delaware.

THE PARTIES

**Plaintiffs**

20.     At all times relevant to this action, Plaintiff Marylynn Hartsel ("Hartsel") was and is a resident of Boca Raton, Florida. She purchased shares in VHF, through Vanguard Global, on February 13, 2006, for investment purposes, and she still holds some of those shares.

21.     Hartsel sues derivatively on behalf of VHF.

22.     At all times relevant to this action, Plaintiff Deanna Parker (f/k/a Deanna McBrearty) ("Parker") was a resident of New York, New York. She currently resides in South Carolina. Through her personal Individual Retirement Account, she first purchased shares in nominal defendant VIEF, through Vanguard European, on or about May 20, 2005 for investment purposes, and she still holds some of those shares.

23.     Parker sues derivatively on behalf of VIEF.

**Nominal Defendants**

24.     Nominal Defendant VHF is a statutory trust organized under the laws of the State of Delaware. It has a principal place of business c/o The Vanguard Group, 455 Devon Park Drive, Wayne, PA 19087-1815. It is registered under the Investment Company Act of 1940 (the "1940 Act") as an open-end investment management company.

25.     VHF offers four different series of shares representing four different mutual funds, one of which is the Vanguard Global fund.

26.    Nominal Defendant VIEF is a statutory trust organized under the laws of the State of Delaware. It has a principal place of business c/o The Vanguard Group, 455 Devon Park Drive, Wayne, PA 19087-1815. It is registered under the 1940 Act as an open-end investment management company.

27.    VIEF offers seven different series of shares representing four different funds, one of which is the Vanguard European fund.

28.    Each of the Nominal Defendants comprises several mutual fund "series" with each series offering a separate class of stock to investors. Each mutual fund series represents a different portfolio of securities. Each portfolio generally has different investment objectives, policies, practices, and risks. The shareholders of each portfolio do not participate in the investment results of any other portfolio and must look solely to the assets of their portfolio for most purposes, including redemption, liquidation, earnings, and capital appreciation. Accordingly, each series of stock represents a different group of stockholders with an interest in a segregated portfolio of securities. Each separate portfolio is commonly referred to as a "mutual fund." Such portfolios or mutual funds are not separate legal entities. However, they are sometimes treated as separate entities for some purposes. For example, each has a separate tax identification number. With a few notable exceptions, the Securities and Exchange Commission ("SEC") and its staff have applied the provisions of the 1940 Act to mutual fund series as if each fund was a separate investment company.

29.    The primary purpose of each of the Nominal Defendants is to serve as an "umbrella" entity that registers as an investment company with the SEC. Because the expenses and administrative burdens of registration can be substantial, mutual fund

complexes such as Vanguard often aggregate many different mutual funds (e.g., Vanguard European and Vanguard Global) as separate "series" under a registered investment company that serves as an umbrella entity (e.g., VIEF or VHF). Each series "borrows" the registration of its umbrella entity and avoids having to register separately. The umbrella organization lends its registration to its respective fund series and signs advisory agreements on their behalf with an asset manager (e.g., defendant The Vanguard Group, Inc. ("Vanguard")).

30.    In this case, a single board of trustees for each Nominal Defendant serves all of its respective series funds, and the board has separate fiduciary duties of undivided loyalty to each of the series (and their respective shareholders) as if they were each separate and distinct entities.

31.    Each of the 36 separate registered investment companies within the Vanguard mutual fund complex, including Nominal Defendants VIEF and VHS, shares a single board of trustees. Accordingly, each of Vanguard's over 179 separate mutual fund series is represented by the same board of trustees.

32.    Each and every one of the trustees that serve on behalf of every separate mutual fund series within the Vanguard complex also serves on the Board of Directors of Vanguard itself. In this way, the same individuals that serve on the boards of trustees for all of Vanguard's registered investment companies and mutual fund series also serve on the Board of Directors of their investment advisor and manager, Vanguard.

33.    Each of the separate mutual funds series managed by Vanguard is entitled to participate in Vanguard's profits and losses. According to a Registration Statement filed by VIEF with the SEC dated June 22, 2006: (i) each Vanguard fund may be called upon to

invest up to 0.4% of its current net assets in Vanguard itself; and (ii) each fund may contribute an unlimited amount to Vanguard's capitalization.

34.     Each of the separate mutual fund series managed by Vanguard maintains a direct investment in Vanguard.

35.     Accordingly, the approximately 128 Vanguard mutual fund series that are not involved in this action have a material interest in making sure that Nominal Defendants do not recover for their claims as alleged herein.

**Defendants**

36.     Defendant The Vanguard Group, Inc. ("Vanguard") is an investment management company.

37.     Vanguard is organized under the laws of the State of Pennsylvania and maintains its principal place of business at 100 Vanguard Boulevard, V26, Malvern, PA 19355.

38.     Vanguard serves as investment advisor to dozens of investment companies.

39.     Vanguard provides its investment advisory services to the Nominal Defendants.

40.     Vanguard provides the Nominal Defendants with corporate management, administrative, marketing and distribution services. The costs of such services are allocated to the various mutual fund series within the Nominal Defendants by the Board of Directors of Vanguard.

41.     Vanguard manages 36 different investment management companies (such as Nominal Defendants), which comprise over 179 separate mutual funds series (such as the Vanguard Funds). Each series of mutual funds is represented by a different series of shares.

42.     Vanguard is owned by the 36 investment management companies it manages.

43.     Each of the over 179 mutual fund series managed by Vanguard has a financial interest in Vanguard.

44.     Vanguard provides investment advisory services to Vanguard European through a division it calls the Vanguard Quantitative Equity Group ("VQEG").

45.     Defendants John J. Brennan, Charles D. Ellis, Rajiv L. Gupta, Amy Gutmann, JoAnn Heffernan Heisen, Andre F. Perold, Alfred M. Rankin, Jr., and J. Lawrence Wilson (collectively, the "Trustees") during all relevant times were members of the boards of trustees of Nominal Defendants as well as other registered investment companies owned and controlled by Vanguard. Each of the Trustees allowed the Nominal Defendants, through the Vanguard Funds, to invest or continue their respective investments in illegal gambling businesses. Each of the Trustees had a separate fiduciary duty to act in the best interests of each of the Nominal Defendants, the Vanguard Funds, and their respective shareholders.

46.     To an even greater degree than the directors of corporations that are not mutual funds, the trustees or directors of mutual funds are responsible for protecting the funds they serve under a unique watchdog role.

47.     Upon information and belief, Brennan, Ellis and Wilson no longer serve on the Board of Trustees for each of the Nominal Defendants. However, the remaining five Trustee defendants, along with the Chairman of the Board F. William McNabb III (who

Vanguard has admitted is an "interested trustee"), still constitute a majority of the Board of Trustees of each of the Nominal Defendants.

48.     In addition to his responsibilities as a trustee of each of the Vanguard Funds, defendant Brennan served since at least 1987 and during all relevant times as the Chairman of the Board and Chief Executive Officer of each of the Vanguard Funds.

49.     In addition to defendants Vanguard and the Trustees (collectively, the "Vanguard European Defendants"), Vanguard Global was also managed, operated or controlled by the defendants in the following paragraphs.

50.     Defendant Acadian Asset Management, LLC ("Acadian"), provides investment advisory services to Vanguard Global and during all relevant times exercised managerial or operational oversight concerning Vanguard Global's investments. Acadian is organized under the laws of the State of Delaware and maintains its principal place of business at One Post Office Square, Boston, MA 02109.

51.     Defendant Marathon Asset Management, LLP, doing business in the United States as Marathon-London ("Marathon"), provides investment advisory services to Vanguard Global and exercised managerial or operational oversight concerning Vanguard Global's investments since at least April 2006. Marathon is organized under the laws of the United Kingdom and maintains an office at 118 North Bedford Road, Suite 202, Mt. Kisco, NY 10549.

52.     Defendants Acadian and Marathon, with the Vanguard European Defendants, are collectively referred to herein as the "Vanguard Global Defendants" or "Defendants" where appropriate.

---

53.     Vanguard, Acadian and Marathon are collectively referred to herein as the "Investment Advisor Defendants" where appropriate.

## FACTS COMMON TO ALL CLAIMS

54.     Section 1955 makes it unlawful to own "all or part of an illegal gambling business."

55.     One who purchases stock of a gambling business becomes a part owner of such business.

56.     At the time that Defendants purchased shares of PartyGaming, SportingBet, Bwin and NETeller, each of these entities was an "illegal gambling business" within the meaning of § 1955 because each of them was a gambling business that (a) violated the laws of one or more of the United States, including, without limitation, the laws of Delaware and New York; (b) involved five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and (c) had been or remained in substantially continuous operation for a period in excess of thirty days or had a gross revenue of $2,000 in any single day.

57.     Each time that Defendants caused one of the Nominal Defendants, through one of the Vanguard Funds, to purchase stock in an illegal gambling business, they caused such Nominal Defendant to become an owner of part of an illegal gambling business in violation of § 1955.

58.     A violation of § 1955 is a predicate crime under RICO. 18 U.S.C. § 1961(1)(B).

59.     By causing the Nominal Defendants to purchase stock of illegal gambling businesses repeatedly within a ten-year period and over a significant period of time, Defendants conducted the affairs of Nominal Defendants through a pattern of racketeering in violation of 18 U.S.C. § 1962(c).

60.     Defendants intended to cause the Nominal Defendants – open-ended investment companies – to continue their ownership of illegal gambling businesses indefinitely. Defendants regularly conducted and conspired to conduct the business of the funds they managed within the Vanguard mutual fund complex by seeking to exploit the risky but potentially lucrative opportunities associated with illegal gambling businesses.

61.     Defendants each knew or should have known, that the businesses were engaged in gambling with persons in the U.S.

62.     Each of the Defendants agreed to cause, and participated in a scheme to cause, the Vanguard Funds to purchase stock in one or more illegal gambling businesses.

63.     Pursuant to the foregoing agreement and scheme, one or more of the Defendants did in fact cause each of the Vanguard Funds, repeatedly and over a significant period of time or in an open-ended scheme, to purchase stock in one or more illegal gambling businesses.

64.     Defendants also conspired to violate 18 U.S.C. §1962(c) within the meaning of 18 U.S.C. § 1962(d).

65.     Each of the Defendants had operational or managerial control over one or more of the Vanguard Funds.

66.     In addition to violating U.S. criminal laws, Defendants' investments in PartyGaming, Sportingbet, Bwin and NETeller were negligent, breached Defendants' fiduciary duties to Plaintiffs, and constituted corporate waste.

67.     In June 2005, the largest private shareholders of PartyGaming offered approximately 23% of the company's shares in an initial public offering ("IPO") on the London Stock Exchange. At that time, almost 90% of PartyGaming's annual revenue of over $300 million came from gamblers in the U.S.

68.     Sportingbet first traded on the Alternative Investment Market of the London Stock Exchange ("AIM") in January 2001. By 2006, Sportingbet's U.S. sportsbook operations constituted the majority of its business. Approximately 56% of its clients were U.S. residents. Because Sportingbet's business strategy heavily targeted U.S. customers, the number of Sportingbet's U.S. sportsbook clients in 2006 rose almost 50% from its 2005 levels. By 2006, its illegal U.S. operations alone generated approximately 34.5 million bets totaling almost $2 billion.

69.     NETeller first traded on the AIM in April 2004. By 2005, 88% of NETeller's customers were North American residents. In 2005, the company generated over $120 million in illegal revenue from U.S. residents alone.

70.     On or about December 16, 2005, Bwin publicly announced that it would invest over $600 million to capture a significant share of the illegal Internet gambling market in the U.S. Bwin disclosed that it would acquire 100% of the shares of Sweden-based Ongame e-solutions AB ("Ongame"), a company that earned 80% of its revenues from gamblers in the U.S. Bwin announced that it would pay for 60% of the purchase price of

Ongame from cash that it intended to raise by issuing and selling an additional 4 million shares of stock.

71.     Defendants knew that by acquiring Ongame, Bwin was undertaking to capture a major portion of the illegal U.S.-based gambling market. In particular, Defendants knew that Bwin would attempt to leverage its existing gambling infrastructure outside the U.S. to expand Ongame's already sizeable illegal distribution channels within the U.S. In support of this unlawful scheme, Defendants caused the Nominal Defendants, through the Vanguard Funds, to purchase Bwin shares both before and after the acquisition of Ongame.

72.     Prior to the time that Defendants made their investments in PartyGaming, Sportingbet, Bwin and NETeller, Defendants knew, or were reckless in not knowing, that law enforcement agencies in the U.S. considered that off-shore gambling businesses that were taking or processing bets from gamblers in the U.S. were illegal gambling businesses within the meaning of § 1955.

73.     On June 11, 2003, the DOJ issued a public warning letter reminding the public that "Internet gambling and offshore sportsbook operations that accept bets from customers in the United States violate Sections 1084, 1952, and 1955 of [Title] 18 of the United States Code, each of which is a Class E felony. Additionally, pursuant to [18 U.S.C. § 2], any person or entity who aids or abets in the commission of any of the above-listed offenses is punishable as a principal violator of those statutes."

74.     NETeller disclosed in its April 8, 2004 prospectus in connection with an IPO of its securities that its operations violated U.S. federal and state gambling laws.

75.    In its June 2005 prospectus that PartyGaming distributed in connection with its IPO, PartyGaming warned prospective investors that "in many countries, including the United States, the Group's activities are considered to be illegal by relevant authorities." In the same prospectus, PartyGaming disclosed to prospective investors that it "generates most of its revenues from customers in the U.S. (approximately 87 per cent. in the first quarter of 2005)."

76.    PartyGaming's prospectus also warned Defendants that:

> The U.S. Department of Justice considers that companies offering online gaming to U.S. residents are in violation of existing U.S. federal laws, including (but not limited to) the Wire Act, the Illegal Gambling Business Act, the Paraphernalia Act and the Travel Act.
>
> ...
>
> There are criminal and civil sanctions for breach of these federal and state prohibitions, which include the possibility of significant fines, injunctions, claims for damages and imprisonment of relevant individuals (such as directors), as well as the repayment of losses suffered by U.S. residents.
>
> ...
>
> In April 2004, the Group [PartyGaming] was informed by Discovery Communications, the television and media company that owns the Travel Channel, that U.S. marshals had seized over $2 million of the Group's funds from Discovery Communications.
>
> ...
>
> Despite the Department of Justice's stance on advertising of online gaming operations, PartyGaming continues to advertise its real money sites in the U.S. through a number of media, including television, print and sponsorship.

77.    PartyGaming disclosed to Defendants that "any action by US authorities that succeeds in prohibiting or materially restricting PartyGaming from offering online gaming in

the US would have very serious consequences for [PartyGaming] and could result in investors losing all or a very substantial part of their investment."

78.     The illegality of PartyGaming's activities was reported in the news media. For example, on June 26, 2005, *The New York Times* reported that, for PartyGaming, the "potential illegalities aren't just a secret hidden in its business plan – they are the centerpiece of its business plan"; and on December 25, 2005, *The New York Times* reported that online gambling sites "are outlaw operations in the eyes of the federal government."

79.     At least one of the employees of Defendants has admitted under oath that he knew of the legal risks in investing in PartyGaming. Neil M. Ostrer confirmed in an Affidavit dated October 27, 2008 ("Ostrer Aff.") that he – and indeed the investment advisory industry in general – knew or should have known that these businesses were taking bets from persons in the United States. Ostrer admits that he knew that "[m]uch of PartyGaming's revenue was derived from online poker games, for which U.S. consumers were a major market. At the same time, *most investment advisors, myself included*, was [sic] aware of numerous attempts by some members of the U.S. Congress to limit online gambling." (emphasis added))

80.     At the time of the investments complained of herein, it was well-established that gambling businesses operating outside the United States violated U.S. criminal law when they take wagers from gamblers in the U.S.

81.     Jay Cohen was convicted in February 2000 of running an Internet gambling business. On appeal, the United States Court of Appeals for the Second Circuit held that Cohen and his organization, an Antiguan corporation that took bets over the Internet from gamblers in New York, violated the Wire Gambling Act, 18 U.S.C. § 1084, whenever there

"was a telephone call or an internet transmission between New York and [defendant] in Antigua" that facilitated a bet or wager on a sporting event. *United States v. Cohen*, 260 F.3d 68 (2d Cir. 2001).

82.    At the time of the investments complained of herein, it was also well-established that gambling businesses operating outside the United States may violate the criminal laws of individual states when they take wagers from gamblers in those states.

83.    In *State ex rel. Nixon v. Interactive Gaming & Communications Corp.*, No. CV-97-7808, 1997 WL 33545763 (Mo. Cir. Ct., Greene Co., May 23, 1997), the court held that a foreign business violates Missouri criminal statutes, including state anti-gambling laws, when it provides gambling-related services to a Missouri resident over the Internet. The Missouri Attorney General has also warned that online gambling is illegal under Missouri's general laws against gambling. See http://ago.mo.gov/publications/gambling3.htm.

84.    In *People ex rel. Vacco v. World Interactive Gaming Corp.*, 185 Misc.2d 852 (N.Y. Co. Sup. Ct. 2000), the New York State Supreme Court held that Cohen's company engaged in illegal gambling activity in violation of New York state law.

85.    In *United States v. Gotti*, 459 F.3d 296 (2d Cir. 2006), the United States Court of Appeals for the Second Circuit affirmed a 2003 conviction under § 1955 predicated on a violation of N.Y. Penal Law § 225.00, holding that "[w]hen bets are placed from New York, the gambling activity is illegal under New York law, regardless of whether the activity is legal in the location to which the bets were transmitted." 459 F.3d at 340.

86.    In addition to the foregoing, before Defendants first caused the Nominal Defendants to purchase shares of PartyGaming, Sportingbet, Bwin and NETeller, it was

public knowledge in the United States, based on various news media reports and public press releases from the DOJ, that:

(a)  In October 2001, New Jersey filed enforcement proceedings against various online gaming entities, including Sportingbet, for violating New Jersey's gambling laws.

(b)  In October 2001, Gold Medal Sports, an online sportsbook located in Curacao, and its principals, pleaded guilty to racketeering in a criminal case brought by the United States Attorney for the Western District of Wisconsin.

(c)  In April 2002, based on pressure brought by the Attorney General of New York, PayPal, the world's largest electronic payment processor, agreed to halt financial transactions on behalf of online gambling companies, which were taking bets from gamblers in New York in violation of New York state law. Banks, including Citibank, also settled claims brought by the New York State Attorney General by agreeing to halt payment processing for unlawful Internet gambling businesses.

(d)  In March 2003, the United States brought suit against PayPal in Missouri for facilitating unlawful gambling activity. In July 2005, PayPal agreed to pay the federal government $10 million in penalties.

(e)  In April 2004, the DOJ seized millions of dollars from cable TV stations that accepted advertising money from illegal Internet gambling businesses, including over $6 million from Discovery Communications.

87.  At various times, from May 1, 2006 and continuing at least through May 1, 2008, the Vanguard European Defendants caused VIEF, through the Vanguard European fund, to purchase millions of dollars' worth of shares of PartyGaming.

88.  In various reports filed with the SEC, VIEF reported that it accumulated 3,018,542 shares of PartyGaming between May 1, 2006 and January 31, 2007.

89.    According to VIEF's annual report filed with the SEC on December 27, 2006, Vanguard European Defendants caused VIEF, through the Vanguard European fund, to purchase an *additional* 281,089 shares of PartyGaming in the three months *after* these defendants learned of the increase in U.S. law enforcement beginning in July 2006.

90.    VIEF did not purchase all 3,018,542 shares of PartyGaming in a single trade. Upon information and belief, when institutional investors such as VIEF take a large position in a security, they often do so in multiple, relatively smaller purchases rather than in large blocks. They do so to avoid driving up the price of shares they intend to purchase through a large order. Upon information and belief, the purchases by the Vanguard European Defendants complained of herein were in line with that industry practice, and they employed dozens of separate purchases to accumulate the Vanguard European fund's ownership stake in PartyGaming.

91.    At various times, from April 1, 2006 and continuing at least through November 1, 2006, the Vanguard European Defendants caused VIEF, through the Vanguard European fund, to purchase millions of dollars' worth of shares of Sportingbet.

92.    In various reports filed with the SEC, VIEF reported that it accumulated 1,015,722 shares of Sportingbet between April 1, 2006 and October 31, 2006.

93.    According to VIEF's SEC filings, Vanguard European Defendants caused the Vanguard European fund to purchase over 150,000 shares in Sportingbet in the second quarter of 2006.

94.    Vanguard European Defendants *increased* the holdings of Sportingbet during and after the increase in law enforcement in July 2006, to over 974,082 shares by July 31, 2006.

95.    According to VIEF's annual report filed with the SEC on December 27, 2006, Defendants caused VIEF, through the Vanguard European fund, to purchase an *additional* 41,640 shares of Sportingbet from August 1 through October 31, 2006.

96.    VIEF did not purchase all 1,015,722 shares of Sportingbet in a single trade. Upon information and belief, the Vanguard European Defendants employed dozens of separate purchases to accumulate the Vanguard European fund's ownership stake in Sportingbet.

97.    At various times, from April 1, 2006 and continuing at least through May 1, 2008, the Vanguard European Defendants caused VIEF, through the Vanguard European fund, to purchase tens of thousands of shares of Bwin.

98.    In various reports filed with the SEC, VIEF reported that it accumulated 70,600 shares of Bwin between April 1, 2006 and January 31, 2007.

99.    According to VIEF's annual report filed with the SEC on December 27, 2006, Defendants caused VIEF, through the Vanguard European fund, to purchase an additional 10,287 shares of Bwin in the three months *after* the U.S. government stepped up its law enforcement efforts in July 2006.

100.    VIEF did not purchase all 70,600 shares of Bwin in a single trade. Upon information and belief, the Vanguard European Defendants employed several separate purchases to accumulate the Vanguard European fund's ownership stake in Bwin.

101.    In a quarterly report filed with the SEC on August 29, 2006, VHF reported that from April 1, 2006 and continuing potentially through September 30, 2006, Vanguard Global Defendants caused VHF, through the Vanguard Global fund, to purchase 607,500 shares of PartyGaming.

102.    Ostrer first began researching gambling stocks in June 2005 on behalf of . As a result of his research, he learned that U.S. customers were a major market for PartyGaming. He also learned of efforts in the U.S. Congress "to regulate or limit Internet gambling." After nearly a year of research, Ostrer caused Vanguard Global to invest in PartyGaming in April 2006, making seven trades over eight months.

103.    Even after the announcements of the prosecution of BetOnSports and its executives in July, and the arrest of Peter Dicks of Sportingbet in September, Defendants continued to invest in PartyGaming. Even after the enactment of the UIGEA in October 2006, Defendants continued to invest in PartyGaming. Defendants did not sell until December of 2006.

104.    At various times, from January 1, 2006 and continuing at least through January 1, 2007, the Vanguard Global Defendants caused VHF, through the Vanguard Global fund, to purchase 68,624 shares of Sportingbet.

105.    VHF did not purchase all 68,624 shares of Sportingbet in a single trade. Upon information and belief, the Vanguard Global Defendants employed several separate purchases to accumulate the Vanguard Global fund's ownership stake in Sportingbet.

106.    At various times, from July 1, 2005 and continuing at least through July 1,

2006, the Vanguard Global Defendants caused VHF, through the Vanguard Global fund, to

purchase 64,859 shares of NETeller.

107.    VHF did not purchase all 64,859 shares of NETeller in a single trade. Upon

information and belief, the Vanguard Global Defendants employed several separate

purchases to accumulate the Vanguard Global fund's ownership stake in NETeller.

108.    On June 1, 2006, a U.S. grand jury indicted London-based BetOnSports Plc

("BetOnSports") – another unlawful Internet gambling business – for racketeering, mail

fraud and running an illegal gambling enterprise because it was accepting wagers from U.S.

bettors in violation of U.S. law.

109.    The indictment was filed under seal, so investors did not learn about it until

July 16, 2006, when BetOnSports' Chief Executive Officer, David Carruthers, was arrested

by U.S. law enforcement. *United States v. BetOnSports Plc*, 4:06-CR-00337-CEJ (E.D. Mo.).

The grand jury also indicted BetOnSports founder Gary Kaplan, its Chief Executive Officer

David Carruthers, and twelve others. Also at that time, a federal district judge in Missouri, in

a companion civil RICO action, issued a temporary restraining order against BetOnSports

enjoining it from "operating an illegal gambling business through Internet web sites and

telephone services." *United States v. BetOnSports Plc*, 4:06-CV-01064 CEJ (E.D. Mo.).

110.    On or about September 8, 2006, Sportingbet's Chairman, Peter Dicks, was

arrested at Kennedy Airport on a Louisiana state warrant on gambling-related charges. This

caused the share prices of the illegal gambling companies to drop even further.

---

111.    Shortly after Dicks' arrest, on September 15, 2006, French law enforcement authorities arrested Bwin's co-chief executives Norbert Teufelberger and Manfred Bodner on gambling-related criminal charges.

112.    The U.S. government's increased enforcement actions directed against illegal Internet gambling included, but were not limited to, criminal and civil enforcement actions like those referred to above and legislative changes intended by Congress to make it more difficult for illegal Internet gambling businesses to circumvent existing laws.

113.    One way Congress sought to make it more difficult for illegal Internet gambling businesses to circumvent existing laws was to restrict their ability to transfer funds and choke off their source of revenue. Such efforts included passage of the Unlawful Internet Gambling Enforcement Act of 2006, 31 U.S.C. § 5361 *et seq.* (the "UIGE").

114.    The UIGEA did not make any gambling activity illegal that had previously been legal. On the contrary, the statute expressly provided that "[n]o provision of this subchapter shall be construed as altering, limiting, or extending any Federal or State law or Tribal-State compact prohibiting, permitting or regulating gambling within the United States." 31 U.S.C. § 5361(b). Thus, the UIGE simply made it more difficult for existing illegal gambling businesses to operate by making it unlawful to transfer funds to or from such entities.

115.    Soon after passage of the UIGE, PartyGaming, Sportingbet, and Bwin withdrew from the U.S. market completely.

116.    On January 1, 2007, the United States filed criminal charges against NETeller founder Stephen Lawrence. The Information charged him with conspiracy to violate various

gambling-related laws, including § 1955. *United States v. Lawrence*, 07 Cr. 597 (S.D.N.Y.). Lawrence pleaded guilty.

117.    The government also proceeded against NETeller itself. The Information charged NETeller with conspiracy to violate various gambling-related laws, including § 1955. NETeller admitted criminal wrongdoing and forfeited $136 million in criminal proceeds as part of a Deferred Prosecution Agreement.

118.    Predictably, the share prices of gambling companies that had been illegally taking bets from gamblers in the US – including PartyGaming, Sportingbet, Bwin and NETeller – fell dramatically during the increased law enforcement beginning in July 2006, including after the arrests of Internet gambling executives and passage of the UIGE.

119.    When Vanguard European and Vanguard Global first invested in PartyGaming, its shares traded around $2.80 per share (not adjusted for a May 2008 reverse 1:10 stock split but converted from pound sterling (GBP) to U.S. dollars). By the time the DOJ succeeded in forcing PartyGaming to withdraw from the US market in October 2006, PartyGaming share price had dropped roughly 80% to approximately $0.60. That 80% drop roughly corresponds to the proportion of PartyGaming's illegal revenue from the United States at the time of withdrawal. PartyGaming's illegal revenue from the United States was approximately 87% at the time of its June 2005 initial public offering and 78% at the time that it withdrew from the U.S. market.

120.    Prior to July 17, 2006, Sportingbet's share price traded at about 400 pence per share and closed June 2006 at 393 pence (approximately $7.30 assuming an average 1.85:1 GBP to U.S. Dollar exchange rate for June 2006). Soon after the BetOnSports prosecutions

were announced, Sportingbet's share price plunged to 171 pence (approximately $3.16) per share. Thereafter, Sportingbet's share price, having fallen significantly in July 2006, plummeted even farther.

121.    Bwin trades on the Austrian Stock Exchange. Because of increased U.S. law enforcement in 2006, Bwin took a EUR € 515 million impairment charge (approximately $685 million based on a 1.32:1 € to US $ exchange rate at the end of 2006).

122.    From May 2006 – approximately when Vanguard European first purchased shares of Bwin – to October 2, 2006, when Bwin bowed to DOJ pressure to stop taking illegal bets in the United States, Bwin's share price dropped from over $129 to $17 (based on a 1.26:1 € to U.S. $ exchange rate on May 2 and October 2, 2006, respectively).

123.    Vanguard Global's last valuation of its NETeller holdings before the first round of arrests in 2006 implied a per-share price of approximately $11. Lawrence's arrest caused a trading suspension of NETeller's shares at approximately $3.45 per share. When trading resumed, its shares opened at $1.30 (based on a 1.96:1 GBP to U.S. Dollar exchange rate on January 16, 2007 and July 25, 2007, respectively).

124.    The drop in the share prices of illegal gambling businesses proximately injured the Nominal Defendants and investors like Plaintiffs who had invested in the Nominal Defendants because the value of their investments in the Nominal Defendants is based on the Net Asset Value ("NAV") of each fund's portfolio. Every dollar lost by Defendants by investing in illegal gambling companies translated into a dollar reduction of the NAV and to the investors in the Vanguard Funds on *a pro rata* basis.

125.    The losses suffered by the Nominal Defendants and investors like Plaintiffs were proximately caused by Defendants' unlawful investments. The value of the illegal gambling companies depended upon the continuation of their illegal revenue streams derived from activities that violated anti-gambling laws in the U.S. This illegal revenue stream constituted a significant portion of the illegal gambling businesses' revenue – which approached 90% in the case of PartyGaming. When increased law enforcement from the U.S. government threatened to choke off this vital source of revenue, the gambling companies' share prices dropped to account for the loss or potential loss of their core revenue streams.

126.    During the time when the Nominal Defendants and investors like Plaintiffs suffered the losses complained of herein, the general market for the type of securities that Defendants told its investors that they would purchase for the Vanguard Funds rose by approximately 20% and 11% for VIEF and VHF, respectively (based on the one year period from October 1, 2005 to October 1, 2006). There was no other material cause for the losses other than the loss or anticipated loss of illegal U.S.-based gambling revenue due to government enforcement efforts. Those losses were the direct, proximate, natural, probable and reasonably foreseeable consequence of Defendants' actions in causing the Vanguard Funds to invest in illegal gambling business in violation of federal criminal law.

127.    As a proximate result of Defendants' acts in causing the Nominal Defendants, through the Vanguard Funds, to invest in illegal gambling businesses, Plaintiffs were injured.

128.    In making the investments in the gambling companies complained of herein, Defendants were deliberately seeking to profit from the wrongdoing in which they knew the gambling companies were engaged.

129.   In making the unlawful investments, Defendants took a reasonably foreseeable risk that the investments would lose value when law enforcement authorities took steps to enforce the law. Plaintiffs' injuries were thus part of the risk that Defendants created by investing in illegal gambling businesses.

130.   Defendants' actions breached Defendants' fiduciary duties to the Vanguard Funds.

131.   Because of Defendants' breaches of their fiduciary duties, they are not permitted to retain any compensation, including management fees, that the Vanguard Funds and their investors paid them from the time that Defendants first caused the Vanguard Funds to invest in an illegal gambling business.

132.   Defendants' actions also constituted negligence in that they breached a duty of care owed to the Vanguard Funds.

133.   Defendants' actions also constituted corporate waste.

134.   Each of the Plaintiffs has been injured as a result of Defendants' breaches of fiduciary duties and negligence.

135.   Each of the Nominal Defendants has been injured as a result of Defendants' breaches of fiduciary duty, negligence and commission of corporate waste.

136.   NETeller's founders, Stephen Lawrence and John Lefebvre, have pleaded guilty to various felonies in connection with operating NETeller, including § 1955. They agreed to forfeit $100 million in criminal proceeds. NETeller also admitted criminal wrongdoing and agreed to forfeit $136 million in criminal proceeds. NETeller was forced to shut down its U.S.-facing operations and abandon its primary source of revenue.

137.   In 2008, one of PartyGaming's founders, Anurag Dikshit, pleaded guilty to gambling offenses in the Southern District of New York. Under his plea agreement, Dikshit agreed to forfeit $300 million in criminal proceeds and face a possible prison sentence.

138.   In April 2009, PartyGaming entered into a non-prosecution agreement with the United States Attorney for the Southern District of New York in which it agreed to forfeit $105 million in criminal proceeds because its principal business violated several federal criminal statutes, including § 1955.

139.   On January 8, 2010, Carruthers was sentenced by Judge Jackson to 33 months imprisonment. Previously, Judge Jackson sentenced BetOnSports founder Gary Kaplan to 51 months in jail and ordered him to forfeit $43,650,000 in criminal proceeds. Judge Jackson also accepted a guilty plea by BetOnSports to racketeering conspiracy and ordered the company to forfeit $28,200,000 in criminal proceeds. BetOnSports was a direct competitor of Bwin.

## ALLEGATIONS CONCERNING RIGHT TO PURSUE DERIVATIVE CLAIMS

140.   Each Plaintiff was a shareholder of the respective Vanguard Fund in which she invested at the time of the transactions of which she complains.

141.   Each Plaintiff is still a shareholder in the respective Vanguard Fund in which she invested.

142.   This action is not a collusive one to confer jurisdiction on this Court which it would not otherwise have.

143.   Each Plaintiff will fairly and adequately represent the interests of the shareholders of the respective Vanguard Funds in which he or she invested.

144.   With respect to all derivative claims alleged herein, Plaintiffs may pursue their claims because the Boards of Trustees of the Vanguard Funds has abdicated any authority to terminate this litigation by refusing Plaintiffs' litigation demand.

(a)   On June 25, 2012, the Supreme Court of the United States denied to grant Plaintiffs' *petition for certiorari* to review the decision of the Supreme Court of Delaware in prior litigation pending between some of the parties in *Hartsel v. The Vanguard Group, Inc.*, C.A. No. 306, 2011. The *Hartsel* decision required Plaintiffs to make a demand on the Boards of Trustees of the Vanguard Funds to pursue the claims alleged herein.

(b)   On July 25, 2012, Plaintiffs made a demand on the Boards of Trustees of the Vanguard Funds and reserved their rights to contest the independence of any member of the Board of Trustees or of any member of a Special Litigation Committee ("SLC") who participates in responding to the demand.

(c)   Not until October 18, 2012 did the Boards of Trustees take any action in response to the demand. At that time, they appointed an SLC that was composed of non-independent "insiders."

(d)   The Boards of Trustees appointed F. Joseph Loughrey, Emerson U. Fullwood, and Mark Loughridge to an SLC to make a recommendation to the Boards of Trustees with respect to Plaintiffs' demand.

(e) The Boards of Trustees have failed to give final decision-making authority to the SLC.

(f) The Boards of Trustees and the SLC knew that Plaintiffs' claims would become barred through the expiration of the statute of limitations on June 25, 2013.

(g) Counsel for Plaintiffs alerted counsel for the SLC to the statute of limitations issue. However, neither the Boards of Trustees nor the SLC have responded to Plaintiff's litigation demand or confirmed that appropriate tolling agreements have been executed to save the claims from forfeiture.

(h) The Boards of Trustees and the SLC are delaying their response to Plaintiffs' demand until after the statute of limitations expires for the purpose of rendering any action on the demand academic.

(i) By their actions and inaction, the Boards of Trustees and the SLC have failed to respond to Plaintiffs' litigation with independence, in good faith, and with due care.

145. Plaintiffs requested the opportunity to provide assistance to and participate in any investigation of the Boards of Trustees or the SLC. The Boards of Trustees and the SLC flatly denied Plaintiffs any access to any investigation.

146. The investigation of the Boards of Trustees and the SLC have been conducted in complete secrecy and without the transparency that the law requires.

147.    All of the trustees of the both Nominal Defendants, including all members of the SLC, serve on the Board of Directors of Defendant Vanguard and therefore have an irreconcilable conflict of interest with respect to the prosecution of this action.

148.    Each of the members of the SLC have been appointed by Defendant Vanguard to serve as a trustee of all investment trusts and funds within the Vanguard mutual fund complex and receive approximately $210,000 per year for doing so.

149.    Each of the members of the SLC is also a director of Defendant Vanguard.

150.    Each of the members of the SLC has separate fiduciary duties to every one of the approximately 179 mutual funds within the Vanguard mutual fund complex.

151.    Loughrey and Fullwood personally have invested over $900,000 each to the other mutual funds within Nominal Defendants whose interests are antagonistic to the interests of Vanguard European and Vanguard Global in pursuing the claims alleged herein and recovering the losses suffered by their respective shareholders. Upon information and belief, Loughridge has at least that amount invested in the antagonistic funds within Nominal Defendants.

152.    The Trustees named as defendants face an inherent conflict of interest because they would be subject to a substantial likelihood of civil and criminal liability if the Nominal Defendants pursued the claims alleged herein against themselves.

153.    The Trustees named as defendants herein along with any inside trustees who also serve as officers of the Trust constitute a majority of the Boards of Trustees of each of the Vanguard Funds.

154.    The Trustee Defendants were just as culpable as the other Defendants. To an even greater degree than directors of ordinary corporations, mutual fund directors, including Trustees herein, are responsible for protecting the Funds' investors under a unique watchdog role. Thus, each of the Trustees had a special duty to ensure that the Vanguard Funds over which they served a watchdog role did not invest in criminal activities and enterprises, including illegal gambling businesses.

155.    Each of the Trustees also had a duty to ensure that the Nominal Defendants had and followed proper control mechanisms to prevent its funds from making any investments in any illegal businesses.

156.    Mutual fund trustees have a duty to monitor the fund investment adviser's trading practices.

157.    The Trustees had a duty to evaluate the portfolio management process, and performance of Vanguard's asset managers, including Acadian and Marathon.

158.    During the course of the conspiracy alleged herein, each of the Trustees received regular reports from portfolio managers and other investment personnel concerning the Vanguard Fund's investments. Through those reports and otherwise, each of the Trustees became aware, even if they may have been previously ignorant, that the Nominal Defendants, through the Vanguard Funds, had invested in illegal gambling businesses. After gaining that knowledge, the Trustees joined the conspiracy, even if they had not previously been members of the conspiracy. The Trustees participated in the conspiracy by deliberately failing to carry out their fiduciary and other legal responsibilities to halt the illegality at a time when doing so would have prevented the injury complained of herein. After the Nominal Defendants and

investors like Plaintiffs suffered the injury complained of herein, and in furtherance of the conspiracy alleged herein, the Trustees failed to take any action to seek redress on behalf of the Nominal Defendants and the Vanguard Funds' investors for the injury they suffered as a result of Defendants' wrongful actions.

159.   If any Trustee remained ignorant of the investments at issue throughout the course of the conspiracy, he or she would nevertheless be liable as if he or she had actual knowledge. Given the Trustees' legal responsibilities and the reports they received, ignorance could only be the result of recklessness or willful blindness, either of which is the legal equivalent of actual knowledge.

160.   Trustees face a substantial risk of personal liability for causing, allowing, or permitting the investments in illegal gambling businesses if this litigation proceeds given the following facts, among others:

(a)   As reported by The New York Times on December 25, 2005, one of the primary Congressional sponsors of the UIGE (Rep. Goodlatte of VA) has warned that if "investment houses are knowingly supporting and promoting illegal [Internet gambling] enterprises [that would be] very bad, and the Congress ought to investigate it."

(b)   The DOJ issued public warnings that Internet gambling companies are criminal organizations and that supporting such criminal organizations was itself a crime.

(c)   The United States Attorney for the Southern District of New York stated in a July 18, 2007 press release in connection with the prosecution of NETeller that "[s]upporting illegal gambling is not a business risk, it is a crime."

(d)   On January 15, 2007, NETeller's founders, Stephen Lawrence and John Lefebvre, were arrested and charged with conspiracy to violate various anti-gambling laws, including § 1955. Lawrence and Lefebvre pleaded guilty to various felonies in connection with operating

NETeller, including § 1955. They also agreed to personally forfeit an additional $100 million;

(e)    Jay Cohen, the CEO of World Sports Exchange, was convicted and sent to prison for operating an illegal gambling business, because his company, although legal in Antigua where it was based, solicited bets from U.S. residents;

(f)    Peter Dicks, the independent, non-executive chairman of Sportingbet was arrested in New York on gambling charges;

(g)    David Carruthers, the chief executive of BetOnSports, was arrested in Dallas and charged with racketeering fraud, tax evasion, and conspiracy;

(h)    Anurag Dikshit, a major shareholder, director, and officer of PartyGaming pleaded guilty to charges of illegal gambling;

(i)    Gary Kaplan, the founder of BetOnSports, pleaded guilty to RICO charges arising from illegal Internet gambling; he has been sentenced to 51 months in prison and ordered to forfeit $43.65 million;

(j)    David Carruthers, the former CEO of BetOnSports, pleaded guilty to racketeering conspiracy and was sentenced to 33 months in prison.

(k)    Discovery Communications was subject to a large asset seizure by the DOJ merely for taking advertising money from PartyGaming.

161.    The Trustees cannot be indemnified, by insurance, by Vanguard, or by another person for their personal financial liability for serious wrongdoing, including violations of §§ 1955 and 1962, because that would be contrary to public policy.

162.    In addition to the foregoing, the relationship between the Nominal Defendants, Vanguard, and the Trustees creates inherent conflicts of interest that support a strong presumption against board independence and disinterest. Unlike most corporations, an investment company, such as VIEF or VHF, is typically created and managed by a pre-existing external organization known as an investment adviser. Because the adviser generally

supervises the daily operation of the fund and often selects affiliated persons to serve on the company's board of directors, the relationship between an investment adviser and a mutual fund is fraught with potential conflicts of interest. The Trustees were all appointed by Vanguard. The Trustees owe their positions to Vanguard, and they can reasonably be expected to be reluctant to take any actions against Vanguard, its executives, or its subsidiaries.

163.   The net assets of the funds within Nominal Defendants represents approximately 6% of the total net assets of all the approximately 179 funds within the Vanguard mutual fund complex. All funds within the Vanguard mutual fund complex have net assets substantially lower than this amount, with average fund representing approximately 0.5% of the total net assets of all the funds within the Vanguard Complex.

164.   Vanguard European represents 8% of the net assets of VIEF.

165.   Vanguard Global represents 25% of the net assets of VHF.

**FIRST CLAIM FOR RELIEF**
**(BREACH OF FIDUCIARY DUTY)**

166.   Plaintiffs repeat and reallege paragraphs 1 through 165 above as if fully set forth herein.

167.   This claim is brought by Plaintiffs on behalf of the Nominal Defendants for the benefit of the Vanguard Funds against all Defendants.

168.   Defendants have breached their fiduciary duties to the Nominal Defendants by causing them, through the Vanguard Funds, to invest in illegal gambling businesses.

169.     In causing the Nominal Defendants, through the Vanguard Funds, to invest in illegal gambling businesses, Defendants acted (a) in bad faith, (b) in a manner that they did not reasonably believe to be in the best interests of the Nominal Defendants, or (c) without the care that ordinarily prudent persons in a like positions would use under similar circumstances.

170.     The Nominal Defendants have been injured as a proximate result of such breach on the part of Defendants and have suffered substantial damages thereby, including the loss in value of their investments and the payment, directly or indirectly, of commissions, fees and other compensation received by Defendants from the time that they first breached their fiduciary duties.

## SECOND CLAIM FOR RELIEF
## (NEGLIGENCE)

171.     Plaintiffs repeat and reallege paragraphs 1 through 170 above as if fully set forth herein.

172.     This claim is brought by Plaintiffs on behalf of the Nominal Defendants for the benefit of the Vanguard Funds against Defendants.

173.     Defendants owe a duty to the Nominal Defendants to exercise reasonable care with respect to making investments for the portfolios of the Vanguard Funds.

174.     Defendants breached their duty of care to the Nominal Defendants by causing the Nominal Defendants, through the Vanguard Funds, to invest in illegal gambling businesses.

175.    The Nominal Defendants have been injured as a proximate and foreseeable result of Defendants' negligence and have suffered substantial damages thereby.

### THIRD CLAIM FOR RELIEF
### (WASTE)

176.    Plaintiffs repeat and reallege paragraphs 1 through 175 above as if fully set forth herein.

177.    This claim is brought by Plaintiffs on behalf of the Nominal Defendants for the benefit of the Vanguard Funds.

178.    Defendants each had a duty to the Nominal Defendants to prevent waste of their assets.

179.    Using assets of the Vanguard Funds to illegally purchase shares of unlawful gambling organizations constituted a waste of assets. In purchasing such shares, Defendants diverted corporate assets for improper or unnecessary purposes.

180.    Use of corporate assets in violation of federal and state criminal laws is *per se ultra vires* and not a permissible exercise of business judgment.

181.    Defendants each breached their duties to prevent the waste of the Nominal Defendants' assets.

182.    The Nominal Defendants, through the Vanguard Funds, have been injured as a direct, proximate and foreseeable result of such breach on the part of the Defendants and have suffered substantial damages thereby.

## FOURTH CLAIM FOR RELIEF
### (AGAINST INVESTMENT ADVISOR DEFENDANTS ONLY)
### (BREACH OF CONTRACT)

183.    Plaintiffs repeat and reallege paragraphs 1 through 182 above as if fully set forth herein.

184.    The Investment Advisory Contract for each of the Vanguard Funds' investments advisors obligates them to perform their duties in compliance with all "applicable laws and regulations."

185.    Investment Advisor Defendants breached their respective Investment Advisory Contracts by causing the Vanguard Funds to own shares in illegal gambling businesses contrary to numerous federal and state criminal laws, including, without limitation Sections 1955 and 1962 of Title 18 of the United States Code, Article 225 of the N.Y. Penal Law, and the legal principle that it is wrongful to seek to profit from the wrongdoing of another.

186.    The Nominal Defendants, through the Vanguard Funds, have been injured as a result of the Investment Advisor Defendants' breach of their Investment Advisory Contracts.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays that, upon the trial of this action, Plaintiffs recover for the Nominal Defendants on behalf of the Vanguard Funds, from each Defendant, jointly and severally, as follows:

a)    Compensatory damages for nominal defendant VIEF on behalf of the Vanguard European fund and its investors representing the loss in value of its investments resulting from Defendants' wrongful conduct;

b)  Compensatory damages for nominal defendant VHF on behalf of the Vanguard Global fund and its investors representing the loss in value of its investments resulting from Defendants' wrongful conduct;

c)  Forfeiture and disgorgement of any commissions, fees or profits received by Defendants from the time of their first wrongful conduct;

d)  An accounting by Defendants of any fees, compensation or other consideration received by them from or an account of nominal defendants VIEF and VHF from the time that any Defendant caused the Nominal Defendants to purchase shares in any illegal gambling business.

e)  Recovery of Plaintiffs' attorneys' fees, expert witness fees, and costs and disbursements of suit;

f)  Pre-judgment and post-judgment interest; and

g)  Such other and further relief to which Plaintiffs are deemed entitled by the Court.

Dated:  June 24, 2013

BIFFERATO LLC

Ian Connor Bifferato (No. 3273)
David W. deBruin (No. 4846)
Thomas F. Driscoll III (No. 4703)
800 N. King Street, Plaza Level
Wilmington, Delaware 19801
Telephone: (302) 225-7600
Facsimile: (302) 254-5383

*Attorneys for Plaintiffs*

OF COUNSEL:

Thomas I. Sheridan, III
HANLY CONROY BIERSTEIN
SHERIDAN FISHER & HAYES, LLP
112 Madison Avenue
New York, NY 10016-7416
Telephone: (212) 784-6400