## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MARYLYNN HARTSEL and DEANNA PARKER, derivatively on behalf of Nominal Defendants,<br><br>Plaintiffs,<br><br>v.<br><br>THE VANGUARD GROUP, INC., JOHN L. BRENNAN, CHARLES E. ELLIS, RAJIV L. GUPTA, AMY GUTMANN, JOANN HEFFERNAN HEISEN, ANDRE F. PEROLD, ALFRED M. RANKIN, JR., and J. LAWRENCE WILSON; ACADIAN ASSET MANAGEMENT, LLC, and MARATHON ASSET MANAGEMENT, LLP,<br><br>Defendants,<br><br>and<br><br>VANGUARD INTERNATIONAL EQUITY INDEX FUNDS, d/b/a VANGUARD EUROPEAN STOCK INDEX FUND, and VANGUARD HORIZON FUNDS, d/b/a VANGUARD GLOBAL EQUITY FUND,<br><br>Nominal Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    C.A. No. 1:13-cv-01128-SLR |

## PLAINTIFF'S MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

OF COUNSEL:

Thomas I. Sheridan, III (*pro hac vice*)
SIMMONS HANLY CONROY
112 Madison Avenue
New York, NY 10016-7416
(212) 784-6404

Nicomedes S. Herrera
112 Madison Avenue
New York, NY 10016-7416

BIFFERATO LLC

Ian Connor Bifferato (#3273)
Thomas F. Driscoll, III (#4703)
800 N. King Street
Wilmington, DE 19801
(302) 225-7600
cbifferato@bifferato.com
tdriscoll@bifferato.com

*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

*Page*

Table of Contents ............................................................................................................................ i
Table of Authorities ........................................................................................................................ ii
Nature and Stage of the Proceedings ............................................................................................. 1
Summary of Argument .................................................................................................................... 2
Statement of Facts ........................................................................................................................... 5
Argument ....................................................................................................................................... 12
I.   This Court Has Subject Matter Jurisdiction ........................................................................ 12
II.  The Boards Abdicated Any Authority to Refuse Plaintiffs' Demand .................................. 13
III. The Boards Wrongfully Refused Plaintiff's Demand ........................................................... 14
    A.   The Members of the Boards Were Not Independent ..................................................... 14
    B.   The Boards Failed to Act in Good Faith by Refusing to Provide Plaintiffs'
        Counsel With a Copy of the Report on Which Its Decision Is Purportedly Based ......... 18
IV. The Boards Waived the Provisions in the Fund's Declaration of Trust ................................ 18
V.  The Complaint States Valid Claims ..................................................................................... 20
    A.   Defendants' Conduct Was Prohibited by § 1955 ........................................................... 20
    B.   Section 1955 Contains No Exception for "Passive" Owners ......................................... 21
    C.   Section1955 Contains No Exception for Illegal Gambling Businesses Traded on
        Foreign Exchanges ........................................................................................................ 23
    D.   The Plain Language of § 1955 Cannot Be Disregarded Merely Because the DOJ
        Has Not Yet Criminally Prosecuted "Passive" Owners of Illegal Gambling
        Businesses ...................................................................................................................... 24
    E.   Section1955 Contains No Exception for Defendants Who Claim Ignorance of the
        Criminal Law ................................................................................................................. 25
    F.   Defendants Were Negligent, and They Breached Their Fiduciary Duties of
        Loyalty, Good Faith, and Due Care ............................................................................... 26
    G.   Defendants Committed Waste ........................................................................................ 28
    H.   The Complaint Alleges Valid Claims Against Trustees. ................................................ 28
    I.    Defendants' Invocation of the Exculpatory Clauses Is Premature ................................. 29
    J.    Investment Advisor Defendants Breached Their Agreements ........................................ 30
VI. Plaintiffs' Claims Are Not Time Barred .............................................................................. 30
Conclusion ..................................................................................................................................... 30

## TABLE OF AUTHORITIES

*Page*

**Cases**

*Aronson v. Lewis*, 473 A.2d 805 (Del. 1984)................................................................. 13

*Beard Research, Inc. v. Kates*, 8 A.3d 573 (Del. Ch. 2010), *aff'd*, 11 A.3d 749 (2010) .............. 26

*Boland v. Boland*, 31 A.3d 529 (Md. 2011)................................................................... 17

*Boyle v. United States*, 556 U.S. 938 (2009) ................................................................ 21

*Brambles USA, Inc. v. Blocker*, 731 F. Supp. 643 (D. Del. 1990)................................................. 19

*Brehm v. Eisner*, 746 A.2d 244 (Del. 2000) ................................................................ 13

*Burks v. Lasker*, 441 U.S. 471 (1979)................................................................... 10, 15

*Clackamas Gastroenterology Associates, P. C. v. Wells*, 538 U.S. 440 (2003) .......................... 20

*Clark v. State*, 287 A.2d 660 (Del. 1972) ................................................................. 25

*Daily Income Fund, Inc. v. Fox,* 464 U.S. 523 (1984).................................................... 16

*DeSimone v. Barrows*, 924 A.2d 908 (Del. Ch. 2007)................................................... 26

*Doctor v. Harrington*, 196 U.S. 579 (1905) ................................................................ 12

*Emerald Partners v. Berlin*, 726 A.2d 1215 (Del. 1999)................................................. 29

*Exxon Corp. v. Hunt*, 475 U.S. 355 (1986)................................................................ 23

*Galfand v. Chestnutt Corp.*, 545 F.2d 807 (2d Cir. 1976) ................................................. 16

*Gamoran v. Neuberger Berman Mgmt. LLC*, [Dkt. 14] 10 Civ. 6234 (LBS) (S.D.N.Y. Nov. 8, 2010), *adhered to on reconsideration*, [Dkt. 21] (Feb. 9, 2011) ........................... 5, 12

*Gamoran v. Neuberger Berman, LLC*, 11 Civ. 7957, 2012 WL 2148217 (S.D.N.Y. June 12, 2012)................................................................................... 14

*Gatz v. Ponsoldt*, 297 F. Supp. 2d 719, 733 (D. Del. 2003) ................................................. 13

*Graham Cty. Soil and Water Conservation Dist. v. U.S.,* 559 U.S. 280 (2010) .......................... 23

*Grimes v. McDonald*, 673 A.2d 1207 (Del. 1996)........................................................ 14, 17, 18

*Guttman v. Huang*, 823 A.2d 492 (Del. Ch. 2003)................................................... 26

*Hartsel v. Vanguard Grp., Inc.*, CIV.A. 5394-VCP, 2011 WL 2421003 (Del. Ch. June 15, 2011), *aff'd*, 38 A.3d 1254 (Del. 2012), *cert denied*, 133 S. Ct. 32 (2012) ......................... 4

*In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959 (Del. Ch. 1996).................................. 29

*In re Delaware Sports Service*, 196 A.2d 215 (Del. 1963) .............................................................. 7

*In re Freeport-McMoran Sulphur, Inc. S'holder Litig.*, 2005 WL 1653923 (Del. Ch. June 30, 2005)............................................................................................................................ 14

*In re Freeport-McMoran Sulphur, Inc. Shareholders Litig.*, C.A. 16729, 2001 WL 50203 (Del. Ch. Jan. 11, 2001) .............................................................................................. 15

*In re Kauffman Mutual Fund Actions*, 479 F.2d 257 (1st Cir. 1973) ......................................... 16

*In re Par Pharmacedtical, Inc., Derivative Litigation*, 750 F. Supp. 641 (S.D.N.Y. 1990) ....................................................................................................................................... 16

*In re Walt Disney Co. Derivative Litig.*, 906 A.2d 27 (Del. 2006).............................................. 26

*Jackson v. Smith*, 254 U.S. 586 (1921) ........................................................................................ 27

*Jam Transp. Inc. v. Harleysville Mut. Ins. Co.*, 937 F. Supp. 2d 532 (D. Del. 2013) ................ 19

*Janssen v. Best & Flanagan*, 662 N.W.2d 876 (Minn. 2003)....................................................... 16

*Jones v. Harris Assocs. L.P.*, 559 U.S. 335 (2010)....................................................................... 16

*La. Mun. Police Employees' Ret. Sys. v. Pyott*, 46 A.3d 313 (Del. Ch. 2012), *rev'd on other grounds*, 2013 WL 1364695 (Del. Apr. 4, 2013) ..................................................... 17, 27

*Laventhol, Krekstein, Horwath & Horwath v. Tuckman*, 372 A.2d 168 (Del. 1976)................. 27

*Long v. State*, 65 A.2d 489 (Del. 1949) ....................................................................................... 25

*Malpiede v. Townson*, 780 A.2d 1075 (Del. 2001) ...................................................................... 29

*McBrearty v. Vanguard Group, Inc.*, 2009 WL 875220 (S.D.N.Y. 2009), *aff'd mem.*, 353 Fed. Appx. 640 (2d Cir. 2009), *cert. denied*, 130 S. Ct. 3411 (June 14, 2010).................... 4

*Meinhard v. Salmon*, 164 N.E. 545 (N.Y. 1928) ........................................................................ 27

*Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techn., Inc.*, 854 A.2d 121 (Del. Ch. 2004) .............................................................................................................................. 27, 29

*Michelson v. Duncan*, 407 A.2d 211 (Del. 1979) ....................................................................... 28

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614 (1985) ...................... 19

*New Haverford P'ship v. Stroot*, 772 A.2d 792 (Del. 2001) ...................................................... 26

*People ex rel. Vacco v. World Interactive Gaming Corp.*, 185 Misc. 2d 852 (N.Y. Co. Sup. Ct. 1999) ..................................................................................................................... 7

*Perrin v. United States*, 444 U.S. 37 (1979) ....................................................................... 20

*Pinkerton v. United States*, 328 U.S. 640 (1946) ................................................................ 21

*Rich ex rel. Fuqi Int'l, Inc. v. Yu Kwai Chong*, 66 A.3d 963 (Del. Ch. 2013) ............................ 13

*Salinas v. United States*, 522 U.S. 52 (1997) ..................................................................... 21

*Sammons v. Ridgeway*, 293 A.2d 547 (Del. 1972) ............................................................... 26

*Sanabria v. United States*, 437 U.S. 54 (1978) ................................................................... 21

*Scattered Corp. v. Chicago Stock Exchange, Inc.,* 701 A.2d 70 (Del. 1997), *overruled on other grounds, Brehm v. Eisner,* 746 A.2d 244 (2000) ....................................................... 17

*Schmeusser v. Schmeusser*, 559 A.2d 1294 (Del. 1989) ...................................................... 27

*Seidl v. Am. Century Companies, Inc*., 10-4152-CV-W-SOW, 2012 WL 7986873 (W.D. Mo. Oct. 31, 2012) ........................................................................................... 17

*State ex rel. Nixon v. Interactive Gaming & Communications Corp.*, 1997 WL 33545763 (Mo. Cir. Ct. May 23, 1997) ................................................................................ 7

*Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362 (Del. 2006) ............................ 29

*Tannenbaum v. Zeller*, 552 F.2d 402 (2d Cir. 1977) ............................................................ 10

*United States v. Ables*, 167 F.3d 1021 (6th Cir. 1999) ...................................................... 9, 25

*United States v. BetOnSports Plc*, 2006 WL 3257797 (E.D. Mo. Nov. 9, 2006) ........................ 10

*United States v. Cohen*, 260 F.3d 68 (2d Cir. 2001) .............................................................. 7

*United States v. Dauray*, 215 F.3d 257 (2d Cir. 2000) .......................................................... 22

*United States v. DiCristina*, 726 F.3d 92 (2d Cir. 2013) ...................................................... 21

*United States v. Gotti*, 459 F.3d 296 (2d Cir. 2006) .............................................................. 7

*United States v. Hawes*, 529 F.2d 472 (5th Cir. 1976) ........................................................... 9

*United States v. International Minerals & Chemical Corp*., 402 U.S. 558 (1971) ..................... 25

*United States v. Merrell,* 701 F.2d 53 (6th Cir 1983) ........................................................... 21

*United States v. Tedder*, 403 F.3d 836 (7th Cir. 2005) ................................................................ 9

*Weems v. United States*, 217 U.S. 349 (1910) ........................................................................... 25

**Statutes and Rules**

10 Del. C. § 8118(a) ..................................................................................................................... 4

11 Del. C. §§ 1401-1411 ......................................................................................................... 7, 26

18 U.S.C. § 1955(b)(1) ................................................................................................................. 8

18 U.S.C. § 2 ............................................................................................................................... 21

31 U.S.C. § 5361(b) .................................................................................................................... 10

8 Del. C. § 220 ........................................................................................................................... 18

Del. Const. art. 2, § 17 ................................................................................................................. 7

Illegal Gambling Business Act, 18 U.S.C. § 1955.............................................................. passim

Racketeering Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961-65 ........................... 4

Unlawful Internet Gambling Enforcement Act, 31 U.S.C. § 5361 *et seq*................................... 10

**Other Authorities**

13E Fed. Prac. & Proc. Juris. § 3607 (3d ed.)............................................................................. 12

68 A.L.R.2d 824........................................................................................................................... 12

C. Doyle, Internet Gambling: Overview of Federal Criminal Law, Congressional
    Research Service (Updated February 27, 2006) ...................................................................... 7

H.R. Rep. No. 91-1549, 91st Congr. 2d Sess., 2 U.S. Code Cong. & Admin. News at
    4029 (1970).......................................................................................................................... 23

### NATURE AND STAGE OF THE PROCEEDINGS

This case involves unlawful investments in illegal offshore gambling businesses by mutual fund fiduciaries. The illegal gambling businesses (and their principals) have forfeited to the U.S. almost $650 million in criminal proceeds. Their founders have pleaded guilty to criminal offenses, subjecting them to significant fines and sentences.

Plaintiffs Marylynn Hartsel and Deanna Parker are investors in two Vanguard mutual funds (the "Funds"). Defendants are fiduciaries who squandered the Funds' assets by knowingly "investing" in four illegal offshore Internet gambling businesses – after being explicitly warned beforehand that they were "investing" in foreign criminal entities that had been specifically identified by the U.S. Department of Justice ("DOJ") as being "illegal gambling businesses." In fact, Defendants continued to *increase* their investments by "doubling down" on their losses *after* the U.S. government began arresting the executives of the gambling businesses.

The law enforcement crackdown successfully dismantled the illegal operations of these gambling organizations in the U.S., causing the Funds to lose a substantial portion of the "investments" because approximately 90% of the organizations' revenue came from their illegal U.S.-facing operations. Because of the significant losses that the Funds' investors suffered as a result of Defendants' flagrant disregard of U.S. criminal statutes and law enforcement efforts, Plaintiffs bring this derivative action on behalf of the Funds alleging claims for negligence, breach of fiduciary duty, waste and breach of contract. Plaintiffs filed their original complaint on June 24, 2103 after making a demand on the Boards almost a year earlier. Thereafter, the Funds' boards of trustees (the "Boards") belatedly attempted to refuse Plaintiffs' demand. After several futile months of trying to obtain the Boards' report, Plaintiffs filed their First Amended Complaint [Doc. No. 8] ("FAC" or "Complaint") on April 28, 2013 to reflect the Boards' refusal. Defendants moved to dismiss on June 6, 2014, and Plaintiffs now oppose.

## SUMMARY OF ARGUMENT

Plaintiffs' claims rest on two simple premises, each of which is sufficient to support liability. First, it is wrongful for U.S. asset managers to make investments in foreign entities when doing so constitutes a felony. Second, it is wrongful to knowingly attempt to profit from illegal activity (regardless of whether the attempt itself is illegal as an independent violation of the criminal law).

The Illegal Gambling Business Act, 18 U.S.C. § 1955 ("§ 1955"), provides that whoever "owns all or part of an illegal gambling business" is guilty of a felony. Each of the four gambling companies in which Defendants invested was an "illegal gambling business" as defined in the statute. Therefore, Defendants' investments of the Funds' assets in those illegal gambling businesses violated § 1955. Those violations support Plaintiffs' claims of negligence, breach of fiduciary duty, waste, and breach of contract because it is *per se* negligent and *ultra vires* to make an illegal investment.

Even if it were not a federal crime to invest in illegal gambling businesses, Defendants' "investments" would still be actionable because, as a matter of common law, it is wrongful for one party to seek to profit from the wrongdoing of another. The essence of any investment is an attempt to profit from the underlying activities conducted by the entity in which the investment is made. It was therefore wrongful for Defendants knowingly to "invest" (and lose) tens of millions of dollars entrusted to them by purchasing shares in illegal gambling businesses. The Funds and their investors are therefore rightfully entitled to recover the losses they suffered as a result of Defendants' investments in criminal organizations.

Defendants seek to bar investors from recovering their losses on the ground that the Boards rejected Plaintiffs' demand that they pursue the claims. Plaintiffs are not barred, however, because every single member of the Boards (including every single member of the

Special Litigation Committee appointed by the Boards) *also* sits on the board of directors of the investment advisor and principal corporate defendant they were asked to sue. It is well-established under Delaware corporate law that common directors who sit on the boards of opposing entities face a disqualifying and irreconcilable conflict of interest when deciding an issue that would benefit one entity and harm the other. As a result, the Boards' refusal of Plaintiffs' demand lacked independence as a matter of law.

Moreover, even assuming *arguendo* that the Boards were independent notwithstanding the 100% interlocking common membership between the boards of the Funds and the investment advisor defendant, Plaintiffs are entitled to pursue their derivative claims because the Boards abdicated any authority to respond to Plaintiffs' demand. A board abdicates its authority to refuse a litigation demand when it acts contrary to its ability to meaningfully respond to the demand. Here, the Boards attempted to cause the forfeiture of the Funds' claims through the expiration of the statute of limitations prior to responding to the demand. This would have made any meaningful response to Plaintiffs' demand impossible. The Board therefore abdicated any authority to refuse Plaintiffs' demand, and Plaintiffs are permitted to proceed with this action even though the Board belatedly purported to "reject" Plaintiffs' demand after suit was filed and after the limitations period would otherwise have expired.

In support of their motion to dismiss, Defendants claim that "[o]ver the past six years, in two distinct court systems and through appeals ending with two denials of *certiorari* by the United States Supreme Court, it has been conclusively established that Plaintiffs' attacks on Defendants and the legality of the investment choices at issue are meritless." (Def. Br. at 1) That is an inaccurate and misleading characterization of the prior decisions in this litigation. No court

has ever ruled on the merits of Plaintiffs' claims or the legality of Defendants' "investment choices."

Seeking to recover for the losses caused by Defendants' illegal investments, Plaintiffs first sued Defendants in federal court in 2008. *McBrearty v. Vanguard Group, Inc.,* 2009 WL 875220 (S.D.N.Y. Apr. 2, 2009), *aff'd mem.*, 353 Fed. Appx. 640 (2d Cir. 2009), *cert. denied*, 130 S. Ct. 3411 (2010). The complaint in that action included claims under the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961-65, and common law claims for negligence, breach of fiduciary duty, and waste. The court held that Plaintiffs failed to state a civil treble damage claim under RICO – not because RICO was not violated, but because Plaintiffs were unable to satisfy RICO's special "direct injury" requirement. The court dismissed Plaintiffs' common law claims for lack of an independent basis for federal jurisdiction, leaving Plaintiffs free to pursue their state claims in another court.

In 2010, Plaintiffs re-filed their state law claims in the Delaware Court of Chancery. Explicitly disavowing any ruling on the merits, that court held that Plaintiffs could not sue unless they first made a demand on the Boards to pursue the claims. *Hartsel v. Vanguard Grp., Inc.*, CIV.A. 5394-VCP, 2011 WL 2421003 (Del. Ch. June 15, 2011), *aff'd*, 38 A.3d 1254 (Del. 2012), *cert denied*, 133 S. Ct. 32 (2012).

In accordance with the ruling in *Hartsel*, Plaintiffs promptly made a demand on the Boards. Plaintiffs' counsel informed counsel for the Special Litigation Committee of the need to act or otherwise preserve investors' claims prior to the expiration of the one-year period under Delaware's Savings Statute, 10 Del. C. § 8118(a), while the Board considered Plaintiffs' demand. The Boards, however, failed *for over a year* to respond to the demand or otherwise preserve the claims from becoming time-barred. Plaintiffs therefore filed the present suit just

before the claims would have been lost through the expiration of the limitations period. Only after the statute of limitations would have expired did the Boards respond to Plaintiffs' demand.

Although this case – like the case brought in Chancery Court – asserts only state common law claims, Plaintiffs filed this case in this federal court. They did so because, in the interim, another federal court had ruled that since the common law claims turned on an interpretation of § 1955, they arose under federal law, and therefore the federal courts have subject matter jurisdiction over them. *See Gamoran v. Neuberger Berman Mgmt. LLC*, [Dkt. 14] 10 Civ. 6234 (LBS) (S.D.N.Y. Nov. 8, 2010), *adhered to on reconsideration*, [Dkt. 21] (Feb. 9, 2011) (refusing to remand case back to the state court where the plaintiff had filed his complaint).

Thus, contrary to Defendants' misleading assertion, the two prior actions did not resolve any issues relating to the merits of Plaintiffs' claims, did not resolve any issue now before the Court, and did not in any way preclude Plaintiffs from pursuing their claims in this case. As we demonstrate below, Plaintiffs' claims have substantial merit, and Plaintiffs have the right under Delaware law to seek just compensation on behalf of the Nominal Defendants.

### STATEMENT OF FACTS

**Parties**

Nominal Defendant Vanguard International Equity Index Funds ("VIEIF") is a statutory trust organized under the laws of Delaware. It is an investment company registered under the Investment Company Act of 1940, and it offers different "series" of shares representing five different mutual funds, including Vanguard European Stock Index Fund ("Vanguard European"). The five different mutual fund series are not separate legal entities, and none has its own separate board of trustees. (FAC ¶¶ 26-28)

Nominal Defendant Vanguard Horizon Funds ("VHF") is also a Delaware statutory trust and an investment company. It offers four series of shares representing four different funds,

including Vanguard Global Equity Fund ("Vanguard Global"). In this brief, "Nominal Defendants" refers to VIEIF and VHF, and "Funds" refers to Vanguard European and Vanguard Global. (FAC ¶¶ 24-25 & 28)

Plaintiff Hartsel owns shares in Vanguard Global, and plaintiff Parker owns shares in Vanguard European. Each was a shareholder at the time of the wrongs alleged in the Complaint, and each still owns the shares in which she invested. (FAC ¶¶ 20-23)

Defendant The Vanguard Group, Inc. ("Vanguard") is the investment advisor primarily responsible for managing the assets of Nominal Defendants and the Funds. (FAC ¶¶ 36-39) The members of the board of Vanguard are the same as the members of all of the Vanguard investment companies, including Nominal Defendants. (FAC ¶ 148)

Defendants John Brennan, Charles Ellis, Rajiv Gupta, Amy Gutmann, JoAnn Heffernan Heisen, Andre Perold, Alfred Rankin, and Lawrence Wilson ("Trustee Defendants") were members of the boards of trustees of both Nominal Defendants at the time of the wrongs complained of. (FAC ¶ 45) Acadian Asset Management, LLC and Marathon Asset Management, LLP provide investment advisory services to Vanguard Global. (FAC ¶¶ 50-53)

**Illegal Internet Gambling**

Offshore Internet gambling businesses first offered their services in or about 1995.[1] The DOJ long ago warned the public that:

> Internet gambling and offshore sportsbook operations that accept bets from customers in the United States violate Sections 1084, 1952, and 1955 of [Title] 18 of the United States Code, each of which is a Class E felony. Additionally, pursuant to [18 U.S.C. § 2], any person or entity who aids or abets in the

---

[1] *See* J. Oliver, *Internet Gambling: Will History Repeat Itself*, available at http://www.uiowa.edu/~cyberlaw/cls01/oliver2.html (last accessed July 24, 2011).

> commission of any of the above-listed offenses is punishable as a principal violator of those statutes.

(FAC ¶ 73)

By 2005, all of the state and federal courts to consider the issue had held that gambling businesses operating outside the U.S. violate federal and state criminal laws when they take wagers from gamblers in the U.S. *See, e.g., United States v. Cohen*, 260 F.3d 68 (2d Cir. 2001); *United States v. Gotti*, 459 F.3d 296, 340 (2d Cir. 2006) (affirming a 2003 conviction); *People ex rel. Vacco v. World Interactive Gaming Corp.*, 185 Misc. 2d 852, 859-63 (N.Y. Sup. Ct. 1999); *State ex rel. Nixon v. Interactive Gaming & Communications Corp.*, 1997 WL 33545763 (Mo. Cir. Ct. May 23, 1997).[2]

Despite the warnings of the DOJ and the clear and consistent rulings of the courts, some illegal gambling businesses thought they could evade law enforcement in the U.S. by offering their services to U.S. gamblers through facilities located in foreign countries, and they continued to flout U.S. law. Several of these criminal enterprises became so brazen that they actually offered their shares to the public – but only on foreign stock exchanges.

One such illegal gambling business in which Defendants invested was PartyGaming.[3] Based in Gibraltar, PartyGaming made an initial public offering of its stock on the Alternative

---

[2] All fifty states have anti-gambling laws. *See* C. Doyle, Internet Gambling: Overview of Federal Criminal Law, Congressional Research Service (Updated February 27, 2006) at Ex. A. In Delaware, unauthorized gambling is prohibited by Del. Const. art. II, § 17, and 11 Del. C. §§ 1401-1411. Unauthorized gambling is also contrary to Delaware public policy. *See In re Delaware Sports Serv.*, 196 A.2d 215 (Del. 1963).

[3] In the interests of brevity, Plaintiffs do not include in this brief the facts relating to the other three illegal gambling businesses at issue: Sportingbet PLC, bwin Interactive Entertainment AG, and NETeller Plc. The facts relating to those entities are set forth in the Complaint in detail.

(Continued . . .)

Investment Market of the London Stock Exchange in June 2005. In its prospectus, it stated that it generated almost 90% of its revenues from customers in the U.S. It also disclosed that "in many countries, including the United States, the Group's activities are considered to be illegal by relevant authorities." (FAC ¶ 75)

The illegality of PartyGaming's principal business was public knowledge. For example, on December 25, 2005, the *New York Times* reported that Internet gambling companies were "outlaw operations in the eyes of the federal government." (FAC ¶ 78)

**The Illegal Gambling Business Act**

Section 1955 provides that whoever "owns all or part of an illegal gambling business" is guilty of a felony. Each of the four gambling companies in which Defendants invested was an "illegal gambling business" as defined in §1955, because each (a) violated the laws of one or more of the United States, (b) involved five or more persons, and (c) had been or remained in substantially continuous operation for a period in excess of thirty days or had a gross revenue of $2,000 in any single day. (FAC ¶¶ 56, 58; *see* 18 U.S.C. § 1955(b)(1)) Because they were "illegal gambling businesses," owning of "all or part" of them was a crime.

**Defendants Knowingly Acquired Shares in Illegal Gambling Businesses**

Beginning in 2005, Defendants sought to profit from the criminal misconduct of the illegal gambling businesses by purchasing their stock. In doing so, they caused the Nominal Defendants to "own part" of four illegal gambling businesses in violation of § 1955. Defendants

---

(. . . continued)

(FAC ¶¶ 4, 66-78, 87-123) The factual differences between the various entities are not material to the relevant issues before the Court.

were well aware of the illegality of these businesses. PartyGaming's prospectus warned Defendants:

> The [DOJ] considers that companies offering online gaming to U.S. residents are in violation of existing U.S. federal laws, including (but not limited to) … the Illegal Gambling Business Act [§ 1955]. There are criminal and civil sanctions for breach of these federal and state prohibitions, which include the possibility of significant fines, injunctions, claims for damages and imprisonment of relevant individuals (such as directors), as well as the repayment of losses suffered by U.S. residents.

(FAC ¶ 76)

Defendants acted with the requisite scienter to support a conviction under § 1955, which is a crime of general criminal intent. *United States v. Ables,* 167 F.3d 1021, 1031 (6th Cir. 1999), *citing United States v. Hawes*, 529 F.2d 472, 481 (5th Cir. 1976). There is no requirement that Defendants be shown to have subjectively known it was illegal to own part of an illegal gambling business. Rather, culpability under § 1955 only requires knowledge of the facts, *i.e.*, that the gambling business was taking bets from gamblers in the United States. *See United States v. Tedder* 403 F.3d 836, 838 (7th Cir. 2005)("[Defendant] told the jury that he thought [the Internet gambling businesses] were upstanding businesses operated in compliance with all laws. This was essentially the tax protester's defense that he just didn't think that the law, however clear, applied to his endeavors. ... The district judge gave appropriate instructions to the jury, which … convicted him").

**Law Enforcement**

In June 2006, the United States and some individual states began a broad-based crackdown on illegal Internet gambling. On June 1, 2006, a U.S. grand jury indicted London-based BetOnSports Plc – an illegal Internet gambling business in which Defendants had not invested but which was materially identical to those in which it had – for racketeering, mail fraud, and running an illegal gambling business. The grand jury also indicted BetOnSports'

founder, its Chief Executive Officer, and twelve others. A few months later, in a companion civil racketeering action, a federal court issued a permanent injunction prohibiting BetOnSports from operating an illegal gambling business. *United States v. BetOnSports Plc*, 2006 WL 3257797 (E.D. Mo. Nov. 9, 2006). In September 2006, the Chairman of Sportingbet – in which Defendants had invested – was arrested on state gambling charges. (FAC ¶¶ 108-110) In October 2006, the Unlawful Internet Gambling Enforcement Act, 31 U.S.C. § 5361 *et seq*. (the "Enforcement Act") was enacted. That Act did not make anything illegal that had previously been legal. 31 U.S.C. § 5361(b). Rather, it was an enforcement measure that made it more difficult for illegal gambling businesses to transfer funds. In the face of these enforcement efforts, PartyGaming and the rest of the gambling companies in which Defendants invested withdrew from the U.S. market – losing the vast majority of their revenue. (FAC ¶ 115)

As PartyGaming had predicted in its prospectus, the share prices of publicly held gambling companies that had been illegally taking bets from gamblers in the U.S. fell significantly following this increase in law enforcement. When Defendants first invested, for example, PartyGaming traded around $2.80 per share. By October 2006, its share price had dropped 80% to approximately $0.60 (corresponding roughly to the percentage of its total revenue attributable to illegal U.S. gambling). (FAC ¶¶ 118-119)

Although they had a fiduciary duty to act as "watchdogs,"[4] the Trustee Defendants allowed the Nominal Defendants to invest, or to continue their respective investments, in the illegal gambling businesses. Indeed, the Trustee Defendants allowed the other Defendants to

---

[4] *See Tannenbaum v. Zeller*, 552 F.2d 402, 406 (2d Cir. 1977), *quoted with approval in Burks v. Lasker*, 441 U.S. 471, 484 (1979).

*increase* the Nominal Defendants' ownership share in the illegal gambling businesses even *after* losses began to mount in the wake of the law enforcement crackdown. (FAC ¶ 94) Perversely, news of the crackdown made the stock even more attractive to Defendants, confirming that their business strategy was to profit from criminal activity.

**Plaintiffs' Demand and the Boards' Abdication of Authority Reject It**

On June 25, 2012, the Supreme Court denied Plaintiffs' petition for *certiorari* to review the decision of the Supreme Court of Delaware in *Hartsel* that had required Plaintiffs to make a pre-suit demand on the boards. Immediately thereafter Plaintiffs made the requisite demand, expressly reserving their rights to contest the independence of any member of the boards or of any member of any Special Litigation Committee ("SLC") who participated in responding to the demand. (FAC ¶ 144)

The boards took no action on the demand until October 18, 2012, when they appointed an SLC to make a recommendation concerning the' demand. The boards chose to deny final decision-making authority to the SLC, reserving that authority for themselves. (FAC ¶ 144)

The Boards and the SLC knew that the one year period to re-file a derivative action under the Delaware Savings Statute would expire on June 25, 2013. Counsel for Plaintiffs alerted counsel for the SLC to the statute of limitations issue. (FAC ¶ 144) Prior to June 25, 2013, however, the Boards and the SLC neither responded to Plaintiffs' demand nor put in place any tolling agreement. When the Boards failed to respond or otherwise agree to tolling agreements by June 24, 2013 – confirming that they were intentionally trying to cause the unnecessary forfeiture of the claims prior to any decision on the demand – Plaintiffs commenced this action. (FAC ¶ 144) The Complaint alleges that, by attempting to strip itself of any ability to make a

*meaningful* decision with respect to Plaintiffs' demand, the Board abdicated its authority to respond to the demand or otherwise terminate this litigation. (FAC ¶ 144)

On July 17, 2013, the SLC issued a report recommending that the Boards reject Plaintiffs' demand. Thereafter, the Boards purported to adopt the SLC's recommendation and reject Plaintiffs' demand. The Boards refused to vouchsafe the report to Plaintiffs, even though Plaintiffs agreed that disclosure would be subject to a standard protective order approved by this Court. (FAC ¶ 147)

The Complaint alleges the Boards delayed their response to Plaintiffs' demand until after the statute of limitations was due to expire for the purpose of rendering any decision on the demand meaningless. (FAC ¶ 144). The Complaint further alleges that by their actions and inactions, the Boards abdicated any authority to respond to Plaintiffs' demand. (FAC ¶ 144)

**ARGUMENT**

## I.   THIS COURT HAS SUBJECT MATTER JURISDICTION

In a case directly in point, *Gamoran v. Neuberger Berman Mgmt. LLC*, [Dkt. 14] 10 Civ. 6234 (LBS) (S.D.N.Y. Nov. 8, 2010), *adhered to on reconsideration*, [Dkt. 21] (Feb. 9, 2011), the court held that there was federal subject matter jurisdiction over the plaintiff's state common law claims because the "complaint presents a necessary, substantial, disputed, and pure question of federal law [under § 1955] whose adjudication in a federal forum would not disrupt the balance of federal and state responsibilities." *Id.* at 9. Under *Gamoran*, this Court has federal question jurisdiction over Plaintiffs' claims.

The Court also has diversity jurisdiction over Plaintiffs' claims. In stockholder derivative actions, the test usually applied is that antagonistic parties are aligned on opposite sides. 13E Fed. Prac. & Proc. Juris. § 3607 (3d ed.) (realignment of parties), *citing Doctor v. Harrington*, 196 U.S. 579, 587 (1905). *See also* 68 A.L.R.2d 824 (citing cases). Here, the necessary

antagonism is present because the Nominal Defendants are controlled by Defendants and represented by their counsel, and the Boards have rejected Plaintiffs' demand.

Defendants' reliance on the "ultimate-interest" test is misplaced. Indeed, "the obvious interests of those in control of the corporation, the typical defendants in derivative suits, and the common practice of employing corporate resources to defend the action make clear the inappropriateness of the ultimate-interest test in this context." 13E Fed. Prac. & Proc. Juris. § 3607 (3d ed.).[5]

## II. THE BOARDS ABDICATED ANY AUTHORITY TO REFUSE PLAINTIFFS' DEMAND

A board abdicates its authority to reject a demand when its unreasonable delay and conduct in responding to a demand renders a "meaningful" response "unlikely or impossible." *See Rich ex rel. Fuqi Int'l, Inc. v. Yu Kwai Chong*, 66 A.3d 963, 965 & 979 (Del. Ch. 2013) (finding that an SLC investigation that "has been left in limbo, with no progress, for several months" demonstrated an abdication of authority to respond to the plaintiff's demand). "[T]the business judgment rule … has no role where directors have either abdicated their functions, or absent a conscious decision, failed to act." *Aronson v. Lewis*, 473 A.2d 805, 813 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

The Boards' deliberate failure (i) to take any action in response to Plaintiff's demand for over a year until after the expiration of Delaware's one-year savings statute or (ii) to enter into an appropriate tolling agreement to preserve Plaintiff's claims from forfeiture, rendered a

---

[5] In *Gatz v. Ponsoldt*, 297 F. Supp. 2d 719, 733 (D. Del. 2003), the court, addressing the jurisdictional issue *sua sponte* (and apparently without the benefit of briefing), appears to have overlooked the substantial case law governing alignment of parties in derivative actions. In any event, the court did not consider whether the plaintiff and nominal defendant were antagonistic.

"meaningful" response to Plaintiff's demand "unlikely or impossible." The Boards have therefore "abdicated" any authority to refuse Plaintiff's demand and terminate this litigation.

Defendants cite *Gamoran v. Neuberger Berman, LLC*, 11 Civ. 7957, 2012 WL 2148217 (S.D.N.Y. June 12, 2012), in trying to blame Plaintiffs for "choosing" to file this suit "perilously close" to the expiration of the limitations period. (Def. Br. At 16) Defendants' reliance on *Gamoran* cuts against them, however, because the board in that case signed tolling agreements to preserve the fund's claims while they investigated the demand. *Id*. at *6. Here, the Boards had virtually the entire one-year period under the Savings Statute to respond to Plaintiffs' demand or execute a tolling agreement. Plaintiffs requested the Boards to safeguard the Funds' claims from forfeiture pending its investigation and waited patiently for the Boards to take action; they filed suit only as a last resort after the Boards refused to act. Had they sued earlier, Defendants would have complained that Plaintiffs sued prematurely.

## III.   THE BOARDS WRONGFULLY REFUSED PLAINTIFF'S DEMAND

### A.  The Members of the Boards Were Not Independent

Even if the Boards had not abdicated their authority to act on Plaintiffs' demand, their decision to reject the demand was wrong. A motion to dismiss based on demand refusal must be denied if the plaintiff alleges facts "creating a reasonable doubt" that "the board acted independently." *Grimes v. Donald*, 673 A.2 1207, 1219 (Del. 1996).

It is well-established that common directors who sit boards of separate entities cannot be independent when deciding an issue that pits the interests of those entities against each other. For example, in *In re Freeport-McMoran Sulphur, Inc. S'holder Litig.*, CIV.A. 16729, 2005 WL 1653923 (Del. Ch. June 30, 2005) (Lamb., *V.C.*) , the court said:

> even if their economic interests were immaterial, the Common Directors were still not able to act independently in the transaction because they sat on both boards and owed the same duty of loyalty to both companies. Their conflicting

loyalties created a structural problem that precluded them from acting independently.

Id. at *8. *Accord In re Freeport-McMoran Sulphur, Inc. Shareholders Litig.*, C.A. 16729, 2001 WL 50203 (Del. Ch. Jan. 11, 2001) (Jacobs, *J.*) ("By virtue of being directors and officers of both FSC and MOXY, these three directors stood on both sides of the Merger, and accordingly, must be deemed to have had a conflicting interest in that transaction. Being thus conflicted, these three directors could not independently and disinterestedly consider the Merger on behalf of the FSC public shareholders")

Here, Plaintiffs allege that the decision of the Boards to reject their demand was not made with the independence required by Delaware law because the Boards had an irreconcilable conflict of interest as a matter of law: the boards of the Nominal Defendants are identical to the board of the principal institutional defendant, Vanguard. These trustees cannot possibly serve the interests of Vanguard and at the same time vindicate the interests of Nominal Defendants who have claims against Vanguard.

Board independence is particularly important in a case such as this one, which involves a mutual fund rather than a conventional corporation. The "potential for abuse inherent in the structure of" mutual funds is now well-recognized. *Burks v. Lasker*, 441 U.S. 471, 480-81 (1979). Most funds are formed, sold, and managed by external organizations, called "investment advisers," that are separately owned and operated. The advisers select the funds' investments and operate their businesses. Since a typical fund is organized by its investment adviser which provides it with almost all management services, a mutual fund cannot, as a practical matter, sever its relationship with the adviser. Therefore, the forces of arm's-length bargaining do not work in the mutual fund industry in the same manner as they do in other sectors of the American economy. As a consequence, it has been said that "'[t]he relationship between investment

advisers and mutual funds is fraught with potential conflicts of interest.'" *Id., quoting Galfand v. Chestnutt Corp.*, 545 F.2d 807, 808 (2d Cir. 1976). *See also Jones v. Harris Assocs. L.P.,* 559 U.S. 335 (2010); *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 536 & 541 (1984).

This lack of genuine independence of mutual fund fiduciaries is particularly problematic in the context of a mutual fund shareholder's litigation demand, where the fiduciary may be called upon to decide whether to sue himself, his colleagues on the board, or the investment advisor to whom he also owes fiduciary duties – and his job. *See In re Kauffman Mut. Fund Actions,* 479 F.2d 257, 269 (1st Cir. 1973) (Curtin, *J*., concurring)  ("I find it hard to imagine that a [mutual fund] director … would authorize a suit, effectively against himself, claiming that the transaction violated the federal antitrust laws. Even independent watchdogs cannot be thought ready to sign a confession of that magnitude").

The appointment of the SLC does not resolve the irreconcilable conflict. Every single member of the SLC is also a member of the board of Vanguard. (FAC ¶ 148)

In any event, the SLC was appointed merely to investigate and recommend. It was granted no authority to make the final decision, and it did not make the final decision. Where, as here, a board appoints a committee merely to investigate claims, the business judgment rule affords no deference to the board's decision. *Janssen v. Best & Flanagan*, 662 N.W.2d 876, 884 (Minn. 2003) ("[a] mere advisory role of the special litigation committee fails to bestow a sufficient legitimacy to warrant deference to the committee's decision by the court"); *accord In re Par Pharm., Inc., Derivative Litig.*, 750 F. Supp. 641, 647 (S.D.N.Y. 1990). The Boards could have – and should have –delegated final decision-making authority to genuinely independent individuals. They failed to do so for the simple reason that genuinely independent individuals could not be counted on to reject Plaintiffs' demand.

Contrary to Defendants' arguments, Plaintiffs are not barred from contesting the Boards' independence by reason of having made the demand. The Delaware Supreme Court long ago rejected the notion that if a board is deemed "independent" for purposes of demand futility, it must also be deemed "independent" when determining wrongful demand refusal. *Scattered Corp. v. Chicago Stock Exch., Inc.*, 701 A.2d 70, 74-75 (Del. 1997), *overruled on other grounds*, *Brehm v. Eisner*, 746 A.2d 244 (Del. 2000); *Grimes*, 673 A.2 at 1219. The Delaware Court of Chancery has dismissed as "incorrect" the notion that a shareholder who makes a demand on the board is somehow barred from contesting a board's independence for wrongful refusal purposes after making a demand. *La. Mun. Police Employees' Ret. Sys. v. Pyott*, 46 A.3d 313, 333 & n. 12 (Del. Ch. 2012), *rev'd on other grounds*, 2013 WL 1364695 (Del. Apr. 4, 2013). On facts not materially distinguishable from those presented here, the court in *Seidl v. Am. Century Companies, Inc.*, 10-4152-CV-W-SOW, 2012 WL 7986873 at *8 (W.D. Mo. Oct. 31, 2012), rejected arguments that the plaintiff should be precluded from challenging the independence of a decision to reject a demand after a prior ruling that demand was not futile.[6]

Contrary to Defendants' argument, because the issues of (i) independence for purposes of demand futility and (ii) independence for purposes of wrongful refusal are different, the doctrine of collateral estoppel does not apply.

---

[6] *Seidl* was governed by Maryland law, and the court relied on *Boland v. Boland*, 31 A.3d 529, 550 n. 25 (Md. 2011), but *Boland* followed Delaware case law on this issue. *Seidl* carefully noted the importance of allowing a derivative plaintiff to challenge a board's independence after making a demand, particularly since the trend in having stricter demand requirements is based in part on the benefits of allowing a board to appoint a truly independent SLC even if the Board ultimately would be conflicted from making the final determination. *Id.* at *4.

### B. The Boards Failed to Act in Good Faith by Refusing to Provide Plaintiffs' Counsel With a Copy of the Report on Which Its Decision Is Purportedly Based

For reasons they have never explained, Defendants have chosen to conceal from Plaintiffs – and now the Court – the report that sets forth the facts learned as a result of the SLC's alleged investigation and the legal and business basis for its alleged recommendation. Plaintiffs agreed that the report could be produced subject to a standard protective order entered by this Court, but Defendants rejected that compromise. The Boards' refusal to provide Plaintiffs – investors whose best interests they purportedly represent – with the report demonstrates their unreasonable hostility to Plaintiffs and unwillingness to make their decision-making transparent to reasonable scrutiny. This is sufficient to raise "a reasonable doubt" that "the board acted independently" in responding to Plaintiffs' demand. *Grimes*, 673 A.2 at 1219. Defendants argue that Plaintiffs should have filed a proceeding under 8 Del. C. § 220 to obtain the Board's report, but that argument makes no sense. The report was prepared after this suit had already been commenced. Moreover, it is the fact of Defendants' obstinate refusal, and not the contents of the report, that creates a "reasonable doubt" concerning the Boards' objectivity.

## IV.    THE BOARDS WAIVED THE PROVISIONS IN THE FUND'S DECLARATION OF TRUST

Prior to rejecting Plaintiffs' demand, neither the Boards nor the SLC raised any question regarding whether Plaintiffs were permitted to make a demand on the Board in the absence of other shareholders representing 10% or more of the shareholders of the Funds. Nor did they request any undertaking for costs. Instead, they proceeded to consider and reject the demand, and in doing so specifically noted that they were *not* insisting or relying on any "limitations" in the Funds' Declarations of Trust, confirming by letter dated August 8, 2013 that the purported limitations did "not serve as a basis" for the Board's refusal of Plaintiffs' demand.

18

Had the Boards timely invoked the provisions of the declarations, Plaintiffs would have had an opportunity to attempt to satisfy them by, for example, providing an undertaking or seeking joinder of additional shareholders. Instead, the Boards knowingly chose not to invoke those provisions and instead to reject the demand on the merits. That intentional relinquishment of a known right constitutes a waiver of those limitations. *See Jam Transp. Inc. v. Harleysville Mut. Ins. Co.*, 937 F. Supp. 2d 532, 536 (D. Del. 2013) (defining "waiver" under Delaware law).

Furthermore, even if those provisions had not been waived, in the circumstances presented here, these particular provisions would be unenforceable as against public policy because they would be unreasonable restraints on the ability of mutual fund shareholders to prosecute derivative claims – which perhaps explains why Defendants chose to waive them. *See Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 637 n.19 (1985).

Defendants argue that the Boards' decision to not to insist or rely on the provisions does not "grant the shareholder standing" that she would not otherwise have. (Def. Br. at 13) This mischaracterizes the nature of the provisions at issue. Those provisions do not purport to limit the *standing* of a derivative plaintiff, and they are not "prerequisites to suit." They merely detail additional limitations that the Board may, if it chooses, insist on *prior* to investigating a demand. Indeed, the provisions themselves recognize that they do not purport to limit a derivative plaintiff's standing, but merely delineate which demands the Board would be *obligated* to investigate absent a waiver of the limitations. Even Defendants characterize the provisions in the Declarations of Trust as relating to conditions "for making a demand" and *not* for "shareholder standing." (Def. Br. at 13)

Defendants' reliance on *Brambles USA, Inc. v. Blocker*, 731 F. Supp. 643 (D. Del. 1990), is misplaced, because that case considered whether a shareholder who acquired stock after a

merger had statutory standing to challenge the merger. It had nothing to do with whether a board can waive additional standards contained in a declaration of trust. Here, it is undisputed that Plaintiffs adequately allege statutory standing. (FAC ¶¶ 20, 22)

## V.   THE COMPLAINT STATES VALID CLAIMS

### A.  Defendants' Conduct Was Prohibited by § 1955

Section § 1955 is unambiguous: whoever "owns all or part of an illegal gambling business" commits a felony. Unless otherwise defined, words in a statute must be interpreted according to "their ordinary, contemporary, common meaning." *Perrin v. United States,* 444 U.S. 37, 42 (1979). According to the ordinary meaning of the term, a corporation is "owned" by its shareholders. *See, e.g., Clackamas Gastroenterology Assocs., P.C. v. Wells,* 538 U.S. 440, 442 (2003)(shareholders described as "own[ing]" a corporation). PartyGaming and the other illegal gambling businesses are corporations. The only way to "own" "all or part" of them was to own their stock.[7] Thus, Defendants' investments violated the plain language of § 1955. By causing the Nominal Defendants to own stock in an illegal gambling business – knowing as they did that the gambling business got most of its revenue from gamblers in the U.S. – Defendants caused the Nominal Defendants to commit felonies. In so doing, they knowingly sought to share in the illicit profits of known criminal activity. By causing the Nominal Defendants to commit

---

[7] Defendants' confused discussion concerning the differences between regular "owners" *versus* "beneficial owners" who own beneficial interests through an intermediary trust, for example, has no bearing on whether shareholders "own" a company. They do.

felonies, Defendants were guilty as principals, both as aiders and abettors and as conspirators, under established principles of federal criminal law.[8]

### B.  Section 1955 Contains No Exception for "Passive" Owners

Seeking a narrowing construction, Defendants argue that "own" should be limited to "active" ownership and that the Court should create an exception for "passive" ownership. In construing § 1955, however, the Court "must follow the plain and unambiguous meaning of the statutory language." *Salinas v. United States* (1997) 522 U.S. 52, 57; *see United States v. DiCristina,* 726 F.3d 92, 97 (2d Cir. 2013) (construing § 1955 and holding that departure from the language of the statute under the rule of lenity requires a "grievous ambiguity or uncertainty" to such an extent "that the Court must simply guess as to what Congress intended"). Where, as here, the statutory language is clear, courts may not resort to a narrowing construction. *Boyle v. United States,* 556 U.S. 938, 950-51 (2009).

The Supreme Court has said that § 1955 "proscribes any degree of participation in an illegal gambling business, except participation as a mere bettor." *Sanabria v. United States,* 437 U.S. 54, 70 n.26 (1978). Even waiters and janitors have been found to be sufficiently involved with illegal gambling to be subject to criminal liability under the § 1955. *United States v. Merrell,* 701 F.2d 53 (6th Cir 1983). Professional money managers who knowingly seek to profit from illegal activity through ownership of a criminal enterprise are far more culpable than waiters and janitors.

---

[8] Anyone who aids or abets the commission of a crime is punishable as a principal violator. 18 U.S.C. § 2. Anyone who conspires to commit a crime is also liable for the substantive crime committed. *Pinkerton v. United States*, 328 U.S. 640 (1946).

Creating a "passive" owner exception to § 1955 would frustrate the purpose of the statute. "Owning" is expressly prohibited by § 1955 because those who own – and thereby seek to profit from – criminal activity are culpable. A judicially-created exception for "passive" ownership would eviscerate § 1955 by excluding from its reach those who are arguably the most culpable.

Defendants suggest that because certain *other* conduct proscribed by § 1955 (*e.g.*, "conducts," "manages," or "directs") involves active participation, "owns" should be judicially limited to ownership that involves active participation. To the contrary, the canon *ejusdem generis*[9] is inapplicable, because "owns" is not a "general" word that "follows" a specific enumeration. Rather, "owns" is a "specific" word that is *part* of the enumeration. *See United States v. Dauray*, 215 F.3d 257 (2d Cir. 2000). *Noscitur a sociis*[10] is inapplicable, because § 1955 also prohibits "financing" illegal gambling businesses, which, like "owning" does not require "active" or "operational" participation. Thus, two of the six prohibitions in § 1955 – "owning" and "financing" – are by their nature "passive."

The prohibition in § 1955 against "financing" illegal gambling businesses demonstrates that Congress wanted to target those who passively provide financial support to such criminal enterprises. The prohibition against "owning all or part" of such entities demonstrates that

---

[9] Latin for "of the same kind or class," *ejusdim generis* is a "canon of construction that when a general word or phrase follows a list of specifics, the general word or phrase will be interpreted to include only items of the same type as those listed ... [*e.g.,*] in the phrase *horses, cattle, sheep, pigs, goats, or any other farm animal*, the general language *or any other farm animal*" would be limited to the type of specific words preceding it. *Black's Law Dictionary* 556 (8th ed. 2004).

[10] Latin for "it is known by its associates," *noscitur a sociis* is a "canon of construction holding that the meaning of an unclear word or phrase should be determined by the words immediately surrounding it." *Black's Law Dictionary* 1087.

Congress wanted to target those who passively seek to profit from them. Adding the word "active" to the prohibitions against "financing" or "owning" would effectively "rob" those terms of their "independent and ordinary significance." *Graham Cty. Soil and Water Conservation Dist. v. U.S.,* 559 U.S. 280, 288 (2010).

Finally, this Court should avoid a construction that would render the words "owns" and "finances" redundant. *Exxon Corp. v. Hunt*, 475 U.S. 355, 369-70 (1986). The other forms of conduct prohibited by § 1955 cover all forms of active involvement in gambling. If "finances" and "owns" also required active participation, then those words would be surplusage.[11]

## C. Section1955 Contains No Exception for Illegal Gambling Businesses Traded on Foreign Exchanges

Nothing in § 1955 suggests a distinction between "illegal gambling businesses" that are closely held and those whose shares are publicly traded. The successful prosecutions of the illegal gambling businesses themselves confirm that there is no implied exception for illegal gambling businesses whose shares are publicly traded on foreign exchanges.[12]

Moreover, a judicially-created exception for illegal businesses listed on foreign exchanges would effectively legitimize off-shore havens for illegal conduct, and it would

---

[11] Defendants rely on the uncertainty expressed by the Vice Chancellor in *Hartsel* regarding the proper interpretation of a federal criminal statute, but in that case the Vice Chancellor expressly disclaimed making a ruling on the merits, stating that the court was reluctant to interpret a federal statute on a matter of first impression. *Hartsel,* 2011 WL 2421003, at *6.

[12] The legislative history indicates that § 1955 was aimed at "large scale gambling businesses." *See* H.R. Rep. No. 91-1549, 91st Congr. 2d Sess., 2 U.S. Code Cong. & Admin. News at 4029 (1970). Public companies (which tend to be larger than private companies) are more likely, rather than less likely, to be within the scope of the legislative purpose of stamping out large scale illegal gambling operations.

effectively permit foreign exchanges to veto U.S. law and give criminal enterprises the ability to access U.S. investment.[13]

### D. The Plain Language of § 1955 Cannot Be Disregarded Merely Because the DOJ Has Not Yet Criminally Prosecuted "Passive" Owners of Illegal Gambling Businesses

Defendants make much of the fact that there has to date been no criminal prosecution of "passive" owners of illegal gambling businesses under § 1955. But the fact that there has not been a prosecution does not make the conduct legal where, as here, the conduct is clearly prohibited by the express terms of the statute. In this regard, Plaintiffs urge the Court to bear in mind that PartyGaming and NETeller were among the first illegal gambling businesses to offer their shares on foreign markets, and they left the U.S. market after a concerted law-enforcement crackdown by the DOJ and various state law-enforcement agencies. They agreed to substantial criminal forfeitures and promised the DOJ that they would dismantle their illegal U.S.-based operations. It is therefore unsurprising that prosecutors have exercised their discretion in not bringing criminal suits against those, such as Defendants, who purchased shares of illegal gambling companies during a relatively brief period of time – and who had to report significant losses to their investors.

---

[13] This concern is not merely academic. For example, the U.S. government identified the Tidewater Company, a publicly-traded company on the Tehran Stock Exchange (Ticker: TAYD1, *see* www.tse.ir/en/ShowIns.aspx?ins=3722699128879020), as an illegal organization that facilitates illicit arms sales to terrorists. *See* www.treasury.gov/resource-center/sanctions/ofac-enforcement/pages/ 20110623.aspx. Even though Tidewater publicly trades on a foreign stock exchange, U.S. investors should not be free to provide capital investment to Tidewater – even "passively." It does not matter if the stock trades on the London, Shanghai, or Tehran exchanges – no foreign authority can provide a safe haven for U.S. investors to provide capital support to entities whose primary activities violate U.S. law.

When § 1955 was enacted in 1970, the Internet did not exist. That did not stop the courts from applying § 1955 to Internet gambling once that activity developed in the 1990s. Similarly, prior to approximately 2000, it was not possible for investors to buy stock in illegal off-shore Internet gambling businesses. But that should not stop this Court from applying § 1955 to ownership of stock in illegal Internet gambling businesses now that the issue has arisen. Section 1955 is broad enough to apply to illegal gambling in the Internet age. As the Supreme Court explained in *Weems v. United States*, 217 U.S. 349 (1910):

> Legislation, both statutory and constitutional, is enacted, it is true, from an experience of evils but its general language should not, therefore, be necessarily confined to the form that evil had theretofore taken. Time works changes, brings into existence new conditions and purposes. Therefore a principle, to be vital, must be capable of wider application than the mischief which gave it birth.

217 U.S. at 373.

### E. Section1955 Contains No Exception for Defendants Who Claim Ignorance of the Criminal Law

As explained above, it is well-established that § 1955 is a crime of general criminal intent. *Ables,* 167 F.3d at 1031. Ignorance of the law is no defense. *See*, *United States v. Int'l Minerals & Chem. Corp*., 402 U.S. 558, 565 (1971)(discussing "general rule that ignorance of the law is no excuse"); *Clark v. State*, 287 A.2d 660, 664 (Del. 1972) (everyone is presumed to know the criminal law); *Long v. State*, 65 A.2d 489, 497 (Del. 1949) (discussing requirements of affirmative defense of good faith)..

Liability under § 1955 only requires knowledge of the facts – that the gambling businesses were taking bets from gamblers in the United States or processing payments relating to such bets. The Complaint alleges that Defendants had the requisite knowledge.

**F. Defendants Were Negligent, and They Breached Their Fiduciary Duties of Loyalty, Good Faith, and Due Care**

Plaintiffs allege that Defendants breached their duty of care to Nominal Defendants and Fund shareholders and that their breach proximately caused Plaintiffs injury. *New Haverford P'ship v. Stroot*, 772 A.2d 792, 798 (Del. 2001) (elements of negligence claim). The negligence claim is particularly strong because Defendants' violated criminal statutes – including § 1955 and state laws such as 11 Del. C. §§ 1401-1411 – which constitutes negligence *per se. See Sammons v. Ridgeway*, 293 A.2d 547 (Del. 1972).

The breach of fiduciary duty claim is also strong. It is "utterly inconsistent with one's duty of fidelity to the corporation to consciously cause the corporation to act unlawfully." *DeSimone v. Barrows,* 924 A.2d 908, 934-35 & n.89 (Del. Ch. 2007) ; *Guttman v. Huang,* 823 A.2d 492, 506 n.34 (Del. Ch. 2003) ("[O]ne cannot act loyally as a corporate director by causing the corporation to violate the positive laws it is obliged to obey"). Defendants breached that duty by causing Nominal Defendants to violate § 1955.[14]

Likewise, fiduciaries breach their duty of good faith when they act "with the intent to violate applicable positive law." *In re Walt Disney Co. Derivative Litig.*, 906 A.2d at 67. Defendants breached their duty of good faith by intentionally investing in businesses that they knew were engaged in illegal gambling.

Furthermore, "a fiduciary may not choose to manage an entity in an illegal fashion, even if the fiduciary believes that the illegal activity will result in profits for the entity." *Metro*

---

[14] The elements of a claim for breach of fiduciary duty are "(1) that a fiduciary duty existed and (2) that the defendant breached that duty." *Beard Research, Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch. 2010), *aff'd*, 11 A.3d 749 (2010).

*Commc'n Corp. BVI v. Advanced Mobilecomm Techn., Inc.,* 854 A.2d 121, 131 (Del. Ch. 2004). Defendants managed Nominal Defendants in an illegal fashion by managing them in such a way as to violate the criminal law.

Plaintiffs do not need to prove that Defendants violated any criminal statutes as a condition to recovering investors' losses. It is a bedrock common law principle that it is wrongful for one party knowingly to seek to profit from the wrongdoing of another. *See Jackson v. Smith,* 254 U.S. 586, 589 (1921) (those who knowingly participate in a breach of fiduciary duty by a third party are jointly and severally liable for all profits obtained); *Laventhol, Krekstein, Horwath & Horwath v. Tuckman*, 372 A.2d 168 (Del. 1976). Even if Defendants did not subjectively know that their investments were criminal, they certainly knew that it was *wrongful* to seek to benefit from the wrongdoing of a third party. There is no good reason to exempt professional fiduciaries who manage mutual funds from that fundamental prohibition. To the contrary: "A trustee is held to something stricter than the morals of the market place," *Meinhard v. Salmon*, 164 N.E. 545, 546 (N.Y. 1928), and "courts have an obligation to enforce that principle." *Schmeusser v. Schmeusser*, 559 A.2d 1294, 1298 n.1 (Del. 1989).

Moreover, investing in criminal enterprises can reasonably be said to be reckless, particularly since such investments can only return a profit so long as the criminal organization successfully evades law enforcement.

In *La. Mun. Police*, the court said: "Delaware law does not charter law breakers ... . Delaware law allows corporations to pursue diverse means to make a profit, subject to a critical statutory floor, which is the requirement that Delaware corporations only pursue 'lawful business' by 'lawful acts.'" 46 A.3d at 352 (internal citations omitted). *Pyott* makes clear that fiduciaries must *both* act legally *and* only pursue lawful business.

It is undisputed that the companies in which Defendants invested were primarily engaged in unlawful business – and that the prospectuses of the companies disclosed the illegality. Therefore, even if neither Defendants nor the Nominal Defendants violated a criminal statute, the complaint still states a claim because by investing in illegal gambling businesses, Defendants were seeking to profit from criminal activity.

Importantly, for the illegal gambling businesses, crime was not merely incidental to an otherwise legitimate business enterprise; it was their primary business. Investing in entities whose fundamental business model is founded on the deliberate violation of U.S. criminal statutes constitutes an egregious violation of duty for professional asset managers and fiduciaries.

### G.  Defendants Committed Waste

"The essence of a claim of waste of corporate assets is the diversion of corporate assets for improper or unnecessary purposes." *Michelson v. Duncan*, 407 A.2d 211, 217 (Del. 1979). The Complaint alleges that "[u]sing assets of the Vanguard Funds to illegally purchase shares of unlawful gambling organizations constituted a waste of assets [because] Defendants diverted corporate assets for improper or unnecessary purposes." (FAC ¶ ) Because it is "improper" under Delaware law to deliberately seek to participate in, and profit from, known criminal activity, Defendants' conduct constitutes waste.

### H.  The Complaint Alleges Valid Claims Against Trustees.

The Complaint adequately alleges claims against the Trustee Defendants.

First, the Complaint pleads that Trustees knew or should have known about the investments. Indeed, the Board is charged with knowledge of what the Fund files with the SEC, and several rounds of illegal investments were made *after* the first investments were included in

the Fund's SEC filings, and *after* the DOJ commenced its crackdown in illegal Internet gambling.

Second, under Delaware law, the Trustees were charged with responsibility to adopt and maintain oversight procedures to assure "compliance with law." *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 970 (Del. Ch. 1996); *see Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006). Failure to do so renders them liable for resulting loss. The Complaint alleges that the trustees failed to enact rules or procedures to prevent either illegal investments or investments in criminal organizations. (FAC ¶ 162).

## I. Defendants' Invocation of the Exculpatory Clauses Is Premature

Whether Defendants are entitled to the protection of the exculpatory clauses is premature. Exculpation is an affirmative defense that the Defendants must plead and prove. It may not be raised in the context of this motion to dismiss. *See Malpiede v. Townson*, 780 A.2d 1075 (Del. 2001); *Emerald Partners v. Berlin*, 726 A.2d 1215, 1223-1224 (Del. 1999) ("the shield from liability provided by a certificate of incorporation provision adopted pursuant to 8 Del. C. Sec. 102(b)(7) is in the nature of an affirmative defense" and "[d]efendants seeking exculpation under such a provision will normally bear the burden of establishing its elements"). The Complaint alleges knowing and reckless misconduct, and that is sufficient at the pleading stage.

Moreover, the exculpatory clauses only cover simple negligence; they do not and as a matter of public policy cannot insulate Defendants from liability for more serious wrongs. The Complaint alleges wrongs that are *per se ultra vires* and that constitute bad faith, gross negligence, willful misfeasance, reckless disregard of duty, and violation of Defendants' duty of loyalty. Trustees' duty to obey the law "cannot be contracted away … since it involves an important public interest." *Metro Commc'n*, 854 A.2d at 142.

### J.  Investment Advisor Defendants Breached Their Agreements

The Complaint also alleges a claim for breach of contract. The Investment Advisory Contract for each of the Vanguard Funds' investments advisors obligates them to perform their duties in compliance with all "applicable laws and regulations." (FAC ¶ 186) Investment Advisor Defendants breached their respective contracts by causing the Funds to own shares in illegal gambling businesses contrary to numerous federal and state criminal laws. (FAC ¶ 187)

## VI.   PLAINTIFFS' CLAIMS ARE NOT TIME BARRED

Plaintiffs' claims were timely filed under the Delaware Savings Statute, 10 Del. C. § 8118(a). The prior dismissal of the common law claims in *McBrearty* was based on lack of subject matter jurisdiction. The prior dismissal in *Hartsel* was based on the court's conclusion that a demand was required prior to suit. Both are "matters of form," having nothing to do with the merits. Accordingly, the Savings Statute applies.[15]

The dismissal "with prejudice" in *Hartsel* simply meant that Plaintiffs could not bring a subsequent action claiming that pre-suit demand was excused. It did not mean that Plaintiffs were barred from bringing a subsequent action after making the required demand if the Boards wrongfully refused the demand or abdicated their authority to respond to it.

### CONCLUSION

Plaintiffs respectfully request Defendants' Motion to Dismiss be denied in its entirety.

Dated:  August 5, 2014

Respectfully submitted,

---

[15] Although a breach of contract claim was not separately pleaded in *Hartsel*, the contract claim arises from the same operative transactions and occurrences as the claims that were pleaded and therefore that claim is also saved by the Savings Statute.

BIFFERATO LLC

OF COUNSEL:

/s/ Thomas F. Driscoll III

SIMMONS HANLY CONROY
Thomas I. Sheridan, III, Esq. (*pro hac vice*)
112 Madison Avenue
New York, NY 10016-7416
(212) 784-6404

Ian Connor Bifferato, Esq. (#3273)
Thomas F. Driscoll, III, Esq. (#4703)
800 N. King Street
Wilmington, DE 19801
(302) 225-7600
cbifferato@bifferato.com
tdriscoll@bifferato.com

Nicomedes S. Herrera, Esq.
112 Madison Avenue
New York, New York 10016

*Attorneys for Plaintiffs*